**SIERRA CREST HOMEOWNERS ASSOCIATION, INC.,**
Appellant,

v.

**Margarita VILLALOBOS and Robert Villalobos, Appellees.**

No. 08-13-00023-CV

Court of Appeals of Texas,
El Paso.

November 2, 2016

Gregory Scott Cagle, Savrick Schumann Johnson McGarr, Kaminski & Shirley, LLP, Austin, TX, for Appellant.

Robert A. Skipworth El Paso, TX, for Appellees.

Before McClure, C.J., not participating, Chew, C.J. (Senior Judge), sitting by assignment, and Barajas, C.J., (Senior Judge), sitting by assignment

## OPINION

DAVID WELLINGTON CHEW, Chief Justice, (Senior Judge)

This is an action to enforce restrictive covenants in a residential subdivision. Margarita and Robert Villalobos built a retaining wall on a lot they owned within the Sierra Crest Subdivision. A portion of the wall collapsed when a Bobcat front-end loader struck it. Alleging that the wall was built without approval, was defective, and posed a safety risk, Sierra Crest Homeowners Association, Inc. sued for declaratory and injunctive relief. The Association also sought to recover civil damages in the amount of $200 for each day of the violation of the restrictive covenants under Section 202.004(c) of the Texas Property Code. After answering, the Villaloboses counter-sued, seeking a declaratory judgment that the Association acted arbitrarily, capriciously, and discriminatorily against them. The case proceeded to a jury trial, and the jury found that the Villaloboses did indeed violate the covenants, but it also found that the Association acted arbitrarily, capriciously, and discriminatorily and was not irreparably and imminently harmed by the breach. The trial court rendered judgment in accordance with the jury's verdict, and awarded attorney's fees to each party.

## FACTUAL AND PROCEDURAL SUMMARY

Sierra Crest Subdivision is a gated community located in the Franklin Mountains in El Paso County, Texas. The Subdivision is governed by a properly recorded Declaration of Covenants, Conditions and Restrictions (Declaration). The Declaration provides that those owning property in the Subdivision automatically become voting and assessment-paying members of the Association, a non-profit corporation. The Declaration assigns the Association various powers and obligations concerning enforcement of the covenants in the Declaration, upkeep of the common areas, and maintenance of the subdivision's aesthetic appeal.

The Association's bylaws vest all powers granted to it in a board of directors.

The Declaration also provides for the creation of an Architectural Control Committee (ACC) to dictate certain construction and aesthetic standards for property ownership within the community. To ensure that property owners abide by these standards, the Declaration requires that plans for improvements be submitted to the Committee for approval before any construction can begin. Specifically, the Declaration provides that:

> After such location with respect to topography and finish grade elevation has been approved and the finish grade of the Lots has been completed, such finish grade shall not be altered, changed or disturbed. Improvements constructed on each Lot must follow the natural mountain terrain with a minimum of excavation and embankment. No retaining walls or excessive cuts and fills shall be permitted without the express written consent of the ... Committee...

In December 2010, the Villaloboses obtained the Committee's approval to construct a home and two-tiered retaining wall on their lot, which was located on the face of the mountain directly above Sierra Crest Drive—the only road providing access to the Subdivision. While the retaining wall was being built, Carlos Figueroa, the engineer hired to design the retaining wall, changed the design to a single-tiered wall. The Villaloboses submitted the revised plans to the City of El Paso but not to the Committee. After receiving the City's approval, Mrs. Villalobos left the revised plans for the Committee's chair, Dr. Price[1], in the Subdivision's guardhouse, as was customarily done.

As we have mentioned, a portion of the retaining wall collapsed when a Bobcat front-end loader struck it. Debris tumbled down the mountainside and a few rocks fell on Sierra Crest Drive. The Association hired Ruben Ponce, Jr., a structural engineer, to examine the remaining portion of the retaining wall. Ponce concluded that the wall had been inadequately designed and built, and that it would collapse. The Association demanded that the Villaloboses submit remediation plans to the Committee by a certain deadline. When they failed to comply, the Association filed suit.

At trial, the contested issues were whether the Villaloboses violated the covenants by failing to obtain approval from the Committee to construct a one-tier retaining wall; whether the wall was inadequately designed and built; whether the Association acted arbitrarily and capriciously in interpreting the covenants and enforcing them; and whether the Association was entitled to injunctive relief. With respect to these issues, the jury was asked:

QUESTION NO. 1:

Did [Appellees] fail to comply with the Declaration ...?

QUESTION NO. 3

Do you find that the exercise of discretionary authority by [SCHA] concerning the restrictive covenants as applied to [Appellees] was arbitrary, capricious or discriminatory?

QUESTION NO. 4:

Do you find that there is any irreparable, imminent harm to [SCHA]'s Subdivision because of the construction of the wall?

---

1. We will refer to the various witnesses by last name only to protect their identities as much as possible, given that it is obvious from the context of the opinion that they live within Sierra Crest. Given the easy availability of location via web mapping, it is our hope that individual homes will not be easily discernible.

The jury answered "Yes" to Questions Nos. 1 and 3 and "No" to Question No. 4. The Association did not object to the charge.

## APPLICABILITY OF SECTION 202.004(a) OF THE TEXAS PROPERTY CODE

The Association's first issue on appeal challenges the jury's answer to Question No. 3. It argues that the jury's finding of an arbitrary, capricious, or discriminatory act by the Association is legally irrelevant and should be disregarded. This jury question is directly related to the Association's cause of action seeking civil damages for the Villaloboses' violation of a restrictive covenant.[2] Section 202.004 of the Texas Property Code, entitled "Enforcement of Restrictive Covenants", provides as follows:

(a) An exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory.

(b) A property owners' association or other representative designated by an owner of real property may initiate, defend, or intervene in litigation or an administrative proceeding affecting the enforcement of a restrictive covenant or the protection, preservation, or operation of the property covered by the dedicatory instrument.

(c) A court may assess civil damages for the violation of a restrictive covenant in an amount not to exceed $200 for each day of the violation.

TEX. PROP. CODE ANN. § 202.004 (West 2007). This statute establishes a cause of action and authorizes a trial court to "assess civil damages" of up to $200 for each day of the violation of a restrictive covenant. *KBG Investments, LLC v. Greenspoint Property Owners' Association, Inc.*, 478 S.W.3d 111, 119 (Tex.App.–Houston [14th Dist.] 2015, no pet.). Subsection (a) "creates a rebuttable presumption that a property owners' association or other representative acts reasonably in exercising its discretionary authority." *La Ventana Ranch Owners' Ass'n, Inc. v. Davis*, 363 S.W.3d 632, 647 (Tex. App.–Austin 2011, pet. denied).

Question No. 3 is related to the rebuttable presumption found in Section 202.004(a). The Association maintains this rebuttable presumption is inapplicable here because it was not required to prove it acted reasonably in filing suit to prevail on its breach-of-contract action. It thus suggests that "since the jury's finding that [it] acted in an arbitrary, capricious, or discriminatory manner has no legal effect on the finding of breach of contract, it is legally irrelevant." We disagree for two reasons. First, the Association was required to prove that it acted reasonably in the exercise of its discretionary authority in order to recover civil damages under Section 202.004(c), but it did not seek a jury question on that issue, nor did it object to submission of Question 3. The jury's answer to that question is not legally irrelevant. Second, as argued by the Villaloboses, the issue before the jury was not whether the Association acted reasonably in filing suit for breach of contract as the Association asserts, but whether it acted arbitrarily, capriciously, or discrimi-

**2.** In its fourth amended petition, the Association sought to recover the statutory penalty authorized by Section 202.004(c) of the Texas Property Code.

natorily in exercising its discretionary authority in enforcing the restrictive covenants against them.

The Association goes a step further to dissect the roles of the Board and the ACC:

> While the implied duty of good faith, as measured by reasonableness, may be applicable to the ACC's discretionary authority to approve or disapprove plans for construction of a proposed improvement, it is not applicable to the Association in this lawsuit because the Association did not exercise any discretionary decisions concerning approval of any improvements to be constructed on the Villalobos Property. That was performed by the ACC and the ACC's discretion in such regard was not challenged by the Villalobos [sic] in this lawsuit.

The Villaloboses counter that the ACC and the Association were acting together in the enforcement activities "and are one and the same." The record reveals that the ACC reported to the Board of Directors as a committee, that Dr. Price sent letters on Association letterhead, and that the Board president intervened with her own correspondence and demands to the extent that it ratified Dr. Price's actions. Most importantly, however, we find direction within the Association's declaration and bylaws.

The Declaration of Covenants, Conditions and Restrictions were admitted as Plaintiff's Exhibit 1. "Association" is defined in Paragraph B-6 as follows:

> Association shall mean and refer to Sierra Crest Homeowners Association, Inc., a non-profit corporation, its successors and assigns, of which each Owner shall be a Member.

Architectural control is contained within Part C, the lot covenants. Paragraph C-2 provides:

> C-2. ARCHITECTURAL CONTROL. No building shall be erected, placed or altered on any Lot until the construction Plans and Specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee as to quality of workmanship and materials, harmony of external design of existing structures and as to location with respect to topography and finish grade elevation. After such location with respect to topography and finish grade elevation has been approved and the finish grade of the Lots has been completed, such finish grade shall not be altered, changed or disturbed. Improvements constructed on each Lot must follow the natural mountain terrain with a minimum of excavation and embankment. No retaining walls or excessive cuts and fills shall be permitted without the express written consent of the Architectural Control Committee. Building location, set back requirements and height will be controlled to optimize the overall appearance of the development and to enhance the Common Open Spaces and to protect the scenic view of each Lot.

> Approval shall be provided as stated in Part D.

Part D pertains to the Architectural Control Committee. Section D-2 addresses procedure:

> D-2 PROCEDURE. The Committee's approval or disapproval as required in these covenants shall be in writing, and in the event the Committee, or its designated representative, fails to approve or disapprove within 30 days after plans and specifications have been submitted to it, of in the event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.

The Bylaws were introduced as Plaintiff's Exhibit 4. Section 12 provides:

> Section 12. Committees. The Board of Directors, by resolution adopted by a majority of the Directors in office, may designate one or more committees of Directors, each of which committees shall consist of two or more Directors, which committees, to the extent provided in such Resolution, shall have and exercise the authority of the Board of Directors in the management of the corporation. The appointment of such committees and the delegation thereof of authority, however, shall not operate to relieve the Board of Directors, or any individual Director, of any responsibility imposed upon it or him by law.

We find no support for the Association's claims that the ACC is an independent entity. To the contrary, it exercises the authority of the Board of Directors in the management of the corporation. In other words, the entity responsible for both filing suit against the Villaloboses and defending against their counter claims is the Homeowners Association. We overrule Issue One.

**SUFFICIENCY OF THE EVIDENCE**

■ In its second and third issues, respectively, the Association challenges the legal and factual sufficiency of the evidence to support the jury's finding that it acted arbitrarily, capriciously, or discriminatorily.

### *Standard of Review*

A "no evidence" or legal insufficiency point is a question of law which challenges the legal sufficiency of the evidence to support a particular fact finding. *Serrano v. Union Planters Bank, N.A.*, 162 S.W.3d 576, 579 (Tex.App.–El Paso 2004, pet. denied). There are two separate "no evidence" claims. *Id.* When the party having

the burden of proof suffers an unfavorable finding, the point of error challenging the legal sufficiency of the evidence should be that the fact or issue was established as "a matter of law." *Id.* When the party without the burden of proof suffers an unfavorable finding, the challenge on appeal is one of "no evidence to support the finding." *Id.*; *In re Estate of Livingston*, 999 S.W.2d 874, 879 (Tex.App.–El Paso 1999, no pet.).

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.–El Paso 2006, no pet.). In conducting our review, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. Even if evidence is undisputed, it is the province of the trier of fact to draw from it whatever inferences it wishes so long as more than one inference is possible. *Id.* at 821. But if the evidence allows only one inference, neither the trier of fact nor the reviewing court may disregard it. *Id.* We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id.* at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency re-

view. *Id.* at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id.* at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *Id.* The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

In reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). When a party attacks the factual sufficiency of an adverse finding on an issue on which the opposing party has the burden of proof, we should set aside the verdict only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We are not permitted to substitute our judgment for that of the jury. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003). Further, we bear in mind that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id.*

### The Association's Position

Dr. Price offered the majority of the testimony behalf of the Association.[3] He testified that Mrs. Villalobos did not seek approval from either the Board or the ACC to change the retaining wall from two tiers to one tier. A change in plans should

have been submitted to the ACC for approval pursuant to the guidelines and the covenants. The wall collapsed on October 31, 2011, leaving a hole approximately twenty feet wide and eight feet deep.

Dr. Price sent a letter to the Villaloboses on November 14, 2011, advising them that they "knowingly have violated several of the architect control committee and city requirements, and now we appear to have an extreme safety issue which must be addressed immediately." Dr. Price continued:

It appears you built a different wall other than the one approved by the architect control committee that was designed by Conde. You also dangerously increased the height of your wall and dirt levels, but did not increase the size of the footing. You did not notify the architect control committee of any changes required to approve before building them.

Mrs. Villalobos did not respond to the letter and never requested a hearing.

This was not the first communication between Dr. Price and Mrs. Villalobos and it is clear from the record that relations were strained between them long before the Halloween accident. On July 19, 2011, before the wall collapsed, Dr. Price wrote her about construction issues.

Q: (Mr. Nickey) And what was the purpose of you sending this letter?

A. (Dr. Price) We wanted to be sure that safety was taken care of, and as well as the rules followed.

Q. Now, can you read the highlighted sections of this letter for the ladies and gentlemen of the jury, please.

A. "We are enforcing the rules exactly as you did. All building materials, such

---

**3.** The remainder of the Association's witnesses testified with regard to whether the wall was inadequately designed and built.

as rocks, must be on your property only. Also, the sand dumped by the road must be removed back as you did with the rocks. As you required of [Mr.] Porras and others, you need to install your water meter immediately. I know of no one who has built without a meter. Everyone will be treated the same. The damage done to the street in front of your lot has been photographed and will have to be repaired upon completion of your house. When you—when your and [Mr.] Francis's homes are finished, [they] will repair their street damage done in front of their property."[4]

Q. So, you're addressing this as a board member, is that correct, or as an ACC committee member?

A. Both.

Dr. Price also testified about Mrs. Villalobos's experience on both the Board of Directors and on the ACC.

Q: (Mr. Nickey) Now, the previous board in the architectural control report of [Ms.] Crouch[5] which is on here—you can look at your screen, if you'd like—can you tell me what the previous board was doing of the ACC?

A. (Dr. Price) "Architect control report by [Ms.] Crouch. Ongoing construction. Resident on Bronze Crest currently has issues with original contractor and will need to resubmit plans due to structural change for building house."

Q. Okay. So, Ms. Villalobos and Ms. Crouch, as board members and on the ACC, are stating that the resident at Bronze Crest who is changing his plans, they require that he resubmit his plans—new plans; is that correct?

A. Yes. That's the way it's always been.

Q. Okay. So, you're not doing anything different with Mrs. Villalobos. You're not discriminating against her saying, "You need to submit plans showing what you're going to be building with the single wall"?

A. None whatsoever.

Q. [T]he previous board is addressing resident [Mr.] Francis; is that correct? At the very top, it says, "Resident [Mr.] Francis"?

A. Yep.

Q. Okay. So, the board was addressing issues with the construction of Mr. Francis's home as of that time, at the end of December and beginning of 2011?

A. Right, and they had several complaints.

Q. Right. And so the board was enforcing the rules against Mr. Francis as you are doing in those previous 17 letters that we talked about earlier; is that correct?

A. That's correct.

Q. And, also, there's another resident, [Mr.] Porras—a letter mailed to Mr. Porras dated December 19th. regarding confirmation of completion of home construction and scarring of the streets. So, they're dealing with the same issues that you were dealing with?

A. Correct.

Thus, the Association's position was that the rules were equally applied and enforced against all of the homeowners.

### The Villaloboses' Position

The first defensive strike came during cross-examination of Dr. Price concerning equal or disparate treatment of the homeowners.

---

4. Neither Mr. Porras nor Mr. Francis testified at trial.

5. Ms. Crouch did not testify at trial.

Q. (Mr. Skipworth) No pergolas are permitted without the approval of the ACC, correct?

A. (Dr. Price) No.

Q. Okay. Well, if Ms. Taber has a pergola and [Ms.] Rivera has a pergola—So, if they have a pergola that was not approved, that's in violation of the covenant?

A. Appears to be.

Q. Thank you. And Ms. Taber is on the board. She's right here, right?·

A. Yes, sir.

Q. And Ms. Rivera is the president of the board?

A. That's correct.[6]

The defense case in chief began with testimony from Mrs. Villalobos, who, as we have already stated, was familiar with the duties of both the Board of Directors and the ACC. She served as a member of the ACC in 2003 and as the committee chair in 2006. She first served on the Board in 2001 but was "kicked off" by the then-president who told her that the other Board members did not like working with her. She believed the dispute involved lot sales, her questioning of procedures, and the fact that she was the only female on the Board. But she was back on the Board in 2003 and served again in 2005, 2006, 2007, 2008, 2009 and 2010.

As noted above, it is apparent from the record that Dr. Price and Mrs. Villalobos were not on friendly terms. One of the residents, Ms. Chizen, testified that she heard Dr. Price speak of "Mague" in a manner that offended her. She told him that if he had any issues with her, he should talk to her. When asked his response, Chizen told the jury:

He became very tense, became very red in the face. And you could see a pulsation of the veins that indicated to me that he became angry or upset with what I suggested.

Chizen was a member of the Board and the Bylaws Committee in 2010. That committee was tasked with reviewing and revising the Declarations if necessary. By 2012, Ms. Rivera had become the President of the Board. Design guidelines were discussed at a meeting on January 30th and it was anticipated that the homeowners would vote on the changes. Ms. Rivera explained that the only change was the title—from architectural bylaws to design guidelines. She further advised that if any changes were going to occur, it would be with the approval of the homeowners association. At that point, Mrs. Villalobos questioned whether the document that had been distributed was the "real" document, or whether the bylaws had already been changed. She had in her hands a different version which had been sent to a realtor friend who was placing an offer on property owned by the Association. According to Mrs. Villalobos, Ms. Rivera looked astonished and insisted that nothing but the title had been changed. At the next meeting in April, the subject arose again. Ms. Rivera purportedly said that since the homeowners did not approve the changes at the last meeting, the Board would move forward to make its own changes. Mrs. Villalobos admitted that the Board had the power to change the guidelines without a vote. The changes were adopted on April 24, 2012 but were not published to the homeowners until July 7th.

At some point within this time frame, Mr. Armendariz was awaiting approval of plans for the building of his home. He had received a copy of the architectural guidelines when he bought his lot. He met personally with Ms. Rivera on January 29th to discuss a number of issues, but eventually

---

**6.** Neither Ms. Taber nor Ms. Rivera testified at trial.

the conversation turned to the design guidelines.

And then she brought up a letter that one of the current homeowners had passed out saying that there's—that she's telling everybody that she has a design guideline.

And since those—that terminology—design guideline—was in her first amended declaration, I just asked her, "well, do you actually have one? Is it true? Did you—did you disseminate on?" And she told me, "Oh, yeah, but that was just my vision of the future."

And so I said, "Well, you know that that's explicitly stated in the new amended declaration where the old document was called the architectural by-laws, and that's not stated in there. So by us passing this—you're going to pass this new document that nobody knows about. So, why is it bad that somebody is trying to stop you from doing this?"

And we went a little bit back and forth, but she didn't—it wasn't like adversarial. We were just discussing it at that point.

Mr. Armendariz then attended the homeowners meeting on January 30th at which the changes in the Bylaws were discussed.

Q. (Mr. Skipworth) During that discussion, was there discussions [sic] concerning the vote of the—how the guidelines would be accepted or voted on?

A. (Mr. Armendariz) Yes, sir. The design guidelines, number one, were supposed to be an old document with just the name change on top. It's what used to be called architectural bylaws. They were just going to change the name.

However, since at that point in time there was not really one published to— or given out to the members, we were concerned about her—or about the board going in and changing everything, because the original first amended declarations said that it could be changed by the board from time to time.

So, we, the membership, were kind of unanimous saying, "No. We do not want to give this sort of power to the board. We want to be able to retain that power and leave it as is." And that came from different membership, including me.

And, then, [Ms.] Rivera was standing up – she's the president of the association. She says, "We will not amend that without membership participation" at that meeting.

He observed the exchange between Ms. Rivera and Mrs. Villalobos concerning two completely different booklets both of which were called design guidelines.

Q. (Mr. Skipworth) And what was Ms. Rivera's response?

A. (Mr. Armendariz) Ms. Rivera said, "I have never seen that document before. You're—" and then she insinuated or outright said, "It must have been your broker, your real estate broker, that created it, Mague. I've never seen that document before."

In doing his own research afterward, Armendariz discovered that there were indeed two versions of the new guidelines available on the Internet, one posted with the City and the other posted to the Association's own website. The new version was posted to elpasocounty.com and indicated it was adopted by the Board on April 24, 2012. He never received anything from the Board but found the new version on the Sierra Crest website in July. In any event, Plaintiff's Exhibit 3 indicated that the Amended Design Guidelines were signed by the Board president, Ms. Rivera, on July 9, 2012.

Taffy Bagley is an attorney who was hired by Mrs. Villalobos when she received a letter from Dr. Price in 2011. She described the author to the jury:

Mr. Price, in the past, had seemed to want to severely enforce all sorts of rules of both the association and rules that weren't association rules, City rules, laws, statutes, all sorts of things. So she was concerned, when she got this letter, that this was just going to be the start of a series of attacks on Villaloboses' plans. So she felt like if she had a lawyer answer for her, that Mr. Price would understand that it was a legal response and not just an opinion from the Villaloboses. So, she asked me to respond.

Ms. Bagley then received a letter from Ms. Rivera dated September 7, 2011. The letter advised that the Association wanted the Villaloboses to install a water meter on the property to keep the dirt watered down, rather than trucking the water in. Ms. Bagley testified that the City had approved trucking the water. The letter then listed a second complaint that the Villaloboses were putting dirt on another owner's property, but Ms. Bagley explained that the Villaloboses had the owner's permission.[7]

Ms. Bagley wrote Dr. Price after the accident to advise him that appropriate measures were being taken with the City to ensure there was no danger to other homeowners. Dr. Price responded on December 20th, telling Ms. Bagley that even though the City had approved the remedial efforts for the wall collapse, the ACC nevertheless had to approve the plan. He also mentioned additional information that was needed, including the drivers' license numbers of the contractors and subcontractors. And as a result of the guideline changes, the deposit required of a homeowner was increased from $5000 to $10,000. Ms. Bagley replied by mail.

Q. (Mr. Skipworth) And then you question the admissions form and the $10,000.00 deposit?

A. (Ms. Bagley) Yes, because in the existing bylaws, those documents and those requirements were not there. And since the president of the association had just told us these things are not being changed, then our question was, well, if they're not being changed, where is this requirement and how can you go from 5,000 to 10,000?

It was in this letter that she opined, "Your unilateral attempts to amend the bylaws are arbitrary and without authority."

Ms. Bagley then received a letter from Ms. Rivera dated January 2, 2012 in which the latter contended that the area was not safe and the Board had to act. This was surprising to Ms. Bagley because Dr. Price had told her in December that he was thrilled that the City determined the scene to be safe. Ms. Bagley then continued:

This is her demand. This is January 2nd. An unauthorized rock wall—I'm not sure why she used "unauthorized", but, anyway, "rock wall and improper soil must be removed at once. Any further construction work, whether remedial or not, must first be submitted in writing to the architectural control committee for approval. Your clients have been provided notice that they must remove the rock wall and the soil, and plans for that work must be submitted to the architectural control committee no later than January 30, 2012."

7. Ms. Bagley responded in writing with regard to the water meter:

Then, I did address in the second paragraph her comment about bringing this water in. She considered it third world transporting of water. And so, again, I reiterated that that was acceptable to the City. We had not been shown anything that said it was prohibited anywhere else, and of course, the Villaloboses were trying to build a home as economically as they could.

Ms. Bagley spoke with her clients. They were unsure whether the Association had the final set of plans. Moreover, before an engineer could develop plans for remediation, some of the dirt had to be removed to determine what had gone wrong. Ultimately, Ms. Bagley responded in writing on January 20th, requesting a meeting because they could not meet the deadline. This certified letter went unclaimed.[8] Consequently, she e-mailed Ms. Rivera as well:

Q. (Mr. Skipworth) Let me show you the envelope for that letter. This is the same situation that you had before?

A. (Ms. Bagley) Yes. But because I had had it before, I was fearful that she would not accept the mail. And since we had this deadline and since we wanted to clear up the confusion, I decided I would e-mail it to her as well. So, I e-mailed the letter. ... And I didn't get a reply, but I did get a—I guess she hit "reply" and then, of course you'd have to find out from her why she didn't leave a message. But, anyway, I did get the reply that at least it went to her computer and somebody sitting there hit "reply".

So, at that point, we thought, well, at least they know we want to get together, we want to work this out, we want to solve this problem. But I didn't get another response. The Villaloboses didn't get a response until they were served with process in this suit.

Q. Were you surprised when the Villaloboses got sued?

A. Yes. I was amazed, when people wanted to try to work things out, that at least that avenue wasn't given a chance.

Q. And would it surprise you that Mr. Price—I don't remember if it was Monday or—it was yesterday when Mr.

Price said that he would be amazed if a meeting was not granted when one was request.

Does that surprise you—that comment?

A. Well, that would surprise me. At least the president of the association who wrote the demand letter obviously didn't have the same opinion that he did.

As a result, Ms. Bagley attended the annual homeowners' meeting on behalf of her clients. When Ms. Rivera inquired whether there was new business, Ms. Bagley stood and said, "I would like to address the issue that some of the homeowners have no ability to communicate with the board because the board will not respond." She then continued her testimony:

She immediately shut me up. She said, "Meeting adjourned. I do not have to accept certified mail." And that was it. We never got a word in edgewise.

On cross-examination, Ms. Bagley read from several letters written by Dr. Price to a variety of homeowners putting them on notice of violations and requesting information, such as the drivers' license numbers of persons having access to the subdivision. The increase in homeowner deposits was mentioned in a letter to Mr. Mathis.

Q. (Mr. Nickey) It says, "Dear [Mr. Mathis], thank you for the form. We still need a copy of your general contractor's driver's license before final approval of the project. Since you've applied before the ACC rules' changes were finalized, you will only pay the 5,000."

So, they're again notifying Mr. Mathis of additional information that they re-

---

**8.** According to Ms. Bagley, this was not the first certified letter that went unclaimed after three delivery attempts.

quire to get his approval to build his home.

A. (Ms. Bagley). Right. And I note that they're telling him, since he applied before the rule changed, he only needed to pay 5,000, despite the fact that they had told the Villaloboses that the rule had changed and they had to pay 10,000.

### Analysis

It is abundantly clear from these excerpts that the jury heard completely different versions of events. Suffice to say that the large reporter's record bears out that the jury listened carefully and parsed the testimony as it related to the questions asked. There is both legally and factually sufficient evidence to support the jury's finding that the Villaloboses breached the Declaration by failing to gain approval of the design for a one-tiered retaining wall. But there is also copious testimony that the actions of the Association, through its various representatives, were arbitrary and capricious. Even the cold words on the written page scream animosity. In our view, frankly, the evidence was more than sufficient for the jury to go either way. But they, as the deciders of credibility and demeanor, acted within their purview to answer the questions as they did. We overrule Issues Two and Three.

## DECLARATORY JUDGMENT

■ In its fourth issue, the Association contends that, for the reasons raised above—*e.g.*, the claimed inapplicability of Section 202.004(a) and the insufficiency of the evidence—the trial court erred in declaring that the Association acted arbitrarily, capriciously, or discriminatorily in its enforcement of the restrictive covenant. The Association maintains that this declaration relates only to an evidentiary presumption under Section 202.004(a) of the

Property Code, and it does not resolve the controversy between the parties or have any impact on the rights, duties, or status of the parties.

■ The purpose of the Declaratory Judgments Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. TEX.CIV.PRAC. & REM.CODE ANN. § 37.002(b) (West 2008). A declaratory judgment is appropriate only if a justiciable controversy exists, resolvable by the declaration sought, concerning the rights and status of the parties. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).

The Association filed suit against the Villaloboses seeking, among other things, to recover the civil damages authorized by Section 202.004(c) of the Texas Property Code. In order to recover those civil damages, the Association was required to prove that it acted reasonably in its enforcement of the restrictive covenant. By their counterclaim, the Villaloboses sought a declaratory judgment that the Association had acted arbitrarily, capriciously, and discriminatorily. Such a finding would rebut a presumption of reasonableness under Section 202.004(a). The challenged declaration resolves a justiciable controversy between the parties, namely, the Association's claim for civil damage made under Section 202.004(c). Issue Four is overruled.

## ATTORNEY'S FEES

■ In its fifth and final issue, the Association complains that the trial court erred in awarding attorney's fees to the Villaloboses. First, it maintains the Villaloboses were not entitled to attorney's fees because they were not entitled to a declaratory judgment. Second, it claims the award of fees was unjust and inequitable "[g]iven the facts and circumstances of this case, the evidence presented at trial, and

the lack of any legal basis to support an award of attorney's fees to Appellees[.]" We disagree.

### Standard of Review

The Declaratory Judgment Act provides that in any proceeding under the Act a court may award costs and reasonable attorney's fees as are equitable and just. *See* TEX.CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2015). The Act "entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). The award of attorney's fees is not dependent on a finding that the party "substantially prevailed." *Barshop v. Medina County Underground Water Conservation District*, 925 S.W.2d 618, 637 (Tex. 1996). It is appropriate to award attorney's fees to the prevailing party in a declaratory judgment action, provided that the trial court believes such fees to be reasonable and necessary and the award of such fees to be equitable and just, but the trial court is not required to do so, and the court may award attorney's fees to the non-prevailing party. *Moosavideen v. Garrett*, 300 S.W.3d 791, 802 (Tex. App.–Houston [1st Dist.] 2008, pet. denied); *State Farm Lloyds v. Borum*, 53 S.W.3d 877, 894 (Tex.App.–Dallas 2001, no pet.). The trial court's award attorney's fees under the Declaratory Judgment Act will not be disturbed on appeal unless an abuse of discretion is shown. *See Bocquet*, 972 S.W.2d at 21.

### Analysis

The Association argues that the trial court abused its discretion by awarding attorney's fees to the Villaloboses because they were not entitled to any declaratory relief. This argument is premised on Issues One through Four, but we have overruled each of those issues. The Association does not assert that the attorney's fees are not reasonable and necessary, but it maintains that the award is not equitable and just under the facts and circumstances of the case. As we noted in our discussion of the legal and factual sufficiency of the evidence, the trial was hotly contested, and while the jury made findings in favor of both parties, the jury's findings in favor of the Villaloboses resulted in the Association not being awarded civil damages under Section 202.004(c). Based on the facts and circumstances of the case, we are unable to find that the trial court's award of attorney's fees to each party is not equitable and just. Having found no abuse of discretion, we overrule Issue Five. The judgment of the trial court is affirmed.