

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00177-CV

_____

HICKS AIRFIELD PILOTS ASSOCIATION, Appellant

V.

BARBARA ANN BRUNSON; KEVIN BRUNSON; RIO CONCHO AVIATION, INC.; SOUTHLAKE HOSPITALITY, INC. D/B/A WING IT CAFÉ!; AND BARBIE LAND DEVELOPMENT, INC., Appellees

---

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-316827-20

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

This appeal follows an eight-day bench trial between Appellant Hicks Airfield Pilots Association (HAPA) and Appellees Barbara Ann Brunson; Kevin Brunson; Rio Concho Aviation, Inc.; Southlake Hospitality, Inc. d/b/a Wing it Café!; and Barbie Land Development, Inc. (collectively, Appellees). At the heart of the trial were issues relating to whether a restaurant (the Café) and an overnight facility and event center (the Lodge) located at Hicks Airfield (the Airfield) presented safety concerns at the Airfield, whether the Café and the Lodge constituted "airport-related commercial businesses" within the meaning of the governing covenants, and whether HAPA had tortiously interfered with various contracts and breached certain fiduciary duties by its actions concerning the Café and the Lodge. Following trial, the trial court issued numerous declarations related to the Café, the Lodge, and the parties' respective rights; it granted permanent injunctions in favor of Appellees; it awarded damages to Appellees based on their tortious-interference claims and breach-of-fiduciary duty claims; and it awarded attorney's fees to Appellees.

In five issues on appeal, HAPA argues that the trial court erred by (1) issuing certain declarations as part of its declaratory judgment, (2) issuing permanent injunctive relief, (3) finding HAPA liable for tortious interference and breach of fiduciary duty, (4) making various findings of fact and conclusions of law, and (5) awarding attorney's fees in favor of Appellees.

2

We will sustain some of HAPA's complaints regarding the trial court's declaratory-judgment rulings and the permanent injunction; we will sustain HAPA's complaints regarding Appellees' tortious-interference and breach-of-fiduciary duty claims; we will overrule HAPA's complaints regarding the trial court's findings of fact and conclusions of law, except its complaint regarding Finding of Fact No. 25, which we sustain; and we will sustain HAPA's complaint regarding the award of attorney's fees. Accordingly, we will affirm in part, reverse and render in part, and reverse and remand in part.

## II. BACKGROUND

### A. Factual Background[1]

The Airfield is a privately owned, public use airport in Tarrant County and is managed by HAPA, a nonprofit entity. HAPA is governed by its bylaws and by certain Covenants, Conditions, and Restrictions (CCRs). The original CCRs were executed in 1985, and they have been amended several times since that time. HAPA is itself managed by a board (the Board), the members of which serve two-year terms.

The property on which the Airfield sits was originally owned by Hicks Airfield, Inc., who was the declarant (the Declarant) listed in the original CCRs—a fact that is relevant to an issue that will be addressed later. There are approximately 452 lots on

---

[1]The majority of the facts will be discussed under the pertinent sections of the opinion analyzing HAPA's complaints. *See* Tex. R. App. P. 47.1.

3

the Airfield. Various Airfield lots have been sold since the execution of the original CCRs.

In 1995, Rio Concho—an entity owned by the Brunsons—purchased a lot on the Airfield from North Fort Worth Aviation, Inc. The lot purchased by Rio Concho—which is the largest lot on the Airfield—is also known as Area H. Article I, Section 9 of the original CCRs contained the following provision concerning Area H:

> The portions of the Property designated by the symbol H shall be maintained, owned[,] and operated by Declarant, its successors or assigns, at their option, as an area for the administration building for [the] Airfield, the sale of fuel . . . for aircraft and motor vehicles . . . , for parking of motor vehicles by Declarant, its agents, customers[,] and other invitees, and/or for any other lawful purpose. The water tank for [the] Airfield will also be maintained in this area.

Rio Concho took the Area H lot subject to any and all restrictions, covenants, and conditions of record. Certain provisions in the then-applicable CCRs contained restrictions pertaining to a lot owner's use of its property. They included the Fifth Amendment to the CCRs which stated that the relevant lots "may only be used for aircraft hangars, general office use, airport related commercial business, and Common Areas[2] related to the use thereof."

The Fifth Amendment acknowledged that certain owners of the relevant lots were "presently using their Lots for other than aircraft hangars, general office use[,] and airport related commercial business"; stated that "the existing Owners of those

---

[2]The CCRs indicated that the "Common Areas" included "the runway, the grass[-]covered open area, the taxiway[s]/roadways, and the safety zone."

4

Lots shall have the right to continue to operate or use their Lots for their present purposes"; and said that "this right shall be personal to the Owners of said Lots" and shall "no longer be valid" upon "the sale, lease, transfer[,] or other disposition . . . of such Lot." The Fifth Amendment contained another provision stating that the owners of the relevant lots "shall have the right to use their Lots for general office use and for all airport related commercial businesses, provided, however, that such uses are consistent with the maintenance of the Property[3] as a first class private airfield."

A few months after purchasing its lot, Rio Concho leased[4] the lot to individuals desiring to open a restaurant at the location. The restaurant was called the Beacon, and it began operating around November 1995. In June 2020, the Beacon ceased operations. During the almost twenty-five years that the Beacon operated as a restaurant, the Board did not send any notice of violation indicating that the Beacon was not an airport-related commercial business.

In late 2019, Barbie Land—whose president is Ms. Brunson—began operating the Lodge near the Beacon.[5] The Lodge is available to rent for overnight guests and

---

[3]The term "Property" has a convoluted meaning in the CCRs, which we need not detail for purposes of our opinion. *See* Tex. R. App. P. 47.1.

[4]A witness at trial estimated that approximately forty percent of the businesses located at the Airfield were operated by tenants.

[5]According to one witness at trial, the Lodge is located approximately a hundred yards to the north of the Café.

also hosts "special events," including things like seminars, rehearsal dinners, bridal showers, and birthday parties.

Around February 2022, Rio Concho entered into a lease with Southlake Hospitality that allowed Southlake Hospitality to operate a restaurant in the location formerly occupied by the Beacon. Southlake Hospitality opened a new restaurant—the Café—in August 2022.

Airfield lot owners—some of whom reside in their hangars—use the taxiways to drive to and from their respective lots, as do the lot owners' customers. Due to the design of the Airfield, customers of the Café and the Lodge must drive on the taxiways to reach those locations.

Due to safety concerns, Rio Concho submitted plans to the Board's Architectural Control Committee (ACC) to construct a fence on Area H. Rio Concho ultimately put up the fence, although the Board maintained that the constructed fence differed from the planned fence that was submitted to the ACC.[6] Rio Concho and the Café also placed signs around the Airport directing the public to the Café. The Board contended that these signs were placed without first seeking approval by the ACC.

---

[6]Michael Forseth, a pilot who runs a flight school at the Airfield, testified that the fence improved safety at the Airfield, stating that "every instructor really appreciates it."

The Airfield has two gates—a south gate (the South Gate) and a north gate (the North Gate). Customers of the Café use both the South Gate and the North Gate. Around May 1, 2020, HAPA placed access-control measures on the use of the South Gate.[7]

## B. Procedural Background

In May 2020, Rio Concho sued HAPA after HAPA began placing restrictions on the access to the South Gate. In its original petition, Rio Concho brought a tortious-interference claim alleging that HAPA was interfering with a lease between Rio Concho and the operators of the Beacon, and it also sought certain declaratory and injunctive relief relating to the South Gate access. In the same month the lawsuit was filed, the trial court entered a temporary restraining order that required HAPA to keep the South Gate open from 6:00 a.m. to 9:00 p.m. but allowed for access control from 9:00 p.m. to 6:00 a.m.[8]

HAPA answered Rio Concho's lawsuit and later filed a counter-petition against Rio Concho and Southlake Hospitality. In its counter-petition—which was filed in July 2022, around one month before the Café opened—HAPA alleged that Rio Concho and Southlake Hospitality had violated the CCRs, and it sought certain

---

[7]In 2014, HAPA placed access-control measures on the use of the North Gate. *See Hicks Airfield Pilots Ass'n v. Hicks Asset Partners, LLC*, No. 02-22-00291-CV, 2023 WL 4007353, at *2 (Tex. App.—Fort Worth June 15, 2023, no pet.) (mem. op.).

[8]Rio Concho and HAPA later entered into a Rule 11 Agreement to allow the South Gate to remain open from 6:00 a.m. to 9:00 p.m. during the course of litigation.

declaratory and injunctive relief regarding the operation of the Café. Specifically, HAPA alleged that the "[u]se of the subject lot as a restaurant does not constitute an 'airport related commercial business'" as required by the CCRs and that the operation of the Café posed "a danger to the lives of HAPA's members, lot owners, and potential patrons of the restaurant" given that such patrons will "drive or walk on runways, block taxiways, or impede aircraft takeoffs and landings." HAPA sought a declaration that Southlake Hospitality's operation of the Café violated the CCRs, and HAPA sought injunctive relief preventing Rio Concho and Southlake Hospitality from operating the Café.

Through a later amended petition, the Brunsons were added as plaintiffs in the lawsuit against HAPA.[9] In their live pleading, Rio Concho and the Brunsons sought, among other things, (1) various declarations regarding the parties and their rights, (2) damages stemming from HAPA's alleged tortious interference with Rio Concho's contract concerning the operation of the Café, (3) damages stemming from HAPA's alleged breach of its fiduciary duty owed to Rio Concho, and (4) certain permanent injunctive relief.

In February 2024, Barbie Land filed a petition in intervention. In that petition, Barbie Land brought claims against HAPA for tortious interference and breach of fiduciary duty and sought declaratory and injunctive relief pertaining to the access to

---

[9]At that same time, the members of HAPA's Board were named as defendants in their individual capacities, although they were later nonsuited.

8

the South Gate and HAPA's authority to impose fines on Barbie Land and remove persons from the Lodge.

A bench trial led to a final judgment, and later, an amended final judgment. In the amended final judgment, the trial court declared that

- the Café and the Lodge are airport-related businesses consistent with the maintenance of the Airfield as a first-class private airfield and Rio Concho and Barbie Land are using their respective lots in accordance with the CCR provisions;

- neither the Café nor the Lodge is an annoyance or a nuisance to other Airfield lot owners;

- HAPA board members may not serve as members on the ACC and no valid ACC existed at the time of the design and construction of the safety barrier on Area H;

- Rio Concho is the assignee of the Airfield's "Declarant as to all rights and privileges of the Declarant on Area H as stated in the Original Declaration," which limits HAPA's authority over Area H;

- certain signage restrictions in the CCRs apply only to lots with hangars or T-hangars, and because Area H has never had such a hangar or T-hangar, the signage restrictions do not apply to Area H;

- HAPA abandoned its restriction that lots must be used only for aircraft hangars, general office use, or airport-related commercial businesses;

- HAPA interpreted and applied the CCRs in an arbitrary, capricious, and discriminatory manner toward Rio Concho, Southlake Hospitality, and Barbie Land; and

- the CCRs do not permit HAPA the authority to exclude the customers, invitees, or guests of the Airfield's lot owners and tenants.

The trial court also permanently enjoined HAPA from changing or restricting access via the South Gate, permanently enjoined HAPA from assessing certain fines against Rio Concho or Southlake Hospitality, and ordered HAPA to "undertake a traffic safety study conducted by a qualified firm to recommend changes designed to prevent land vehicles from making dangerous incursions onto the runway."

In the amended final judgment, the trial court also found that HAPA had tortiously interfered with Rio Concho's and Barbie Land's "respective contracts with tenants, customers, or invitees." It awarded Rio Concho damages of $34,276 and Barbie Land damages of $500 stemming from HAPA's tortious interference. The trial court also found that HAPA had breached its fiduciary duty owed to Rio Concho and Barbie Land, awarding Rio Concho damages of $26,000 and Barbie Land damages of $16,000. The trial court awarded Rio Concho and Barbie Land their joint attorney's fees in the amount of $396,628 and Southlake Hospitality its attorney's fees in the amount of $19,418. The trial court also entered findings of fact and conclusions of law. This appeal followed.[10]

---

[10]After HAPA filed its notice of appeal, Rio Concho filed a cross-notice of appeal. Rio Concho later moved to dismiss its cross-appeal, and we granted the motion and dismissed the cross-appeal. *See Hicks Airport Pilots Ass'n v. Brunson*, No. 02-25-00177-CV, 2025 WL 2626864, at *1 (Tex. App.—Fort Worth Sept. 11, 2025, no pet.) (mem. op.).

## III. DISCUSSION

### A. HAPA's Complaints Regarding the Declaratory Judgment

In its first issue, HAPA argues that the trial court erred by issuing certain declarations in the amended final judgment because the court either improperly interpreted the CCRs or its declarations were supported by legally or factually insufficient evidence.

#### 1. Standard of Review

When a declaratory judgment is rendered after a bench trial, we review the trial court's conclusions of law de novo. *City of Forest Hills v. Benson*, 555 S.W.3d 284, 288 (Tex. App.—Fort Worth 2018, no pet.). We review a trial court's findings of fact under the same legal and factual sufficiency standards that we use for jury questions. *Walterscheid v. Walterscheid*, 557 S.W.3d 245, 257 (Tex. App.—Fort Worth 2018, no pet.).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence

unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When we reverse the trial court's judgment because the evidence is legally insufficient, we must explain our analysis with specificity; we cannot merely say that we have reviewed all the evidence and reached a conclusion contrary to the factfinder's. *Citizens Nat'l Bank in Waxahachie v. Scott*, 195 S.W.3d 94, 96 (Tex. 2006). Generally, we must render judgment when the evidence is legally insufficient. Tex. R. App. P. 43.3; *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 176 (Tex. 1986); *Nat'l Life & Acc. Ins. v. Blagg*, 438 S.W.2d 905, 909 (Tex. 1969).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

12

## 2. Applicable Law

A restrictive covenant is a negative covenant that limits permissible uses of land. *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 279 (Tex. 2018). Restrictive covenants should be liberally construed to give effect to their purpose and intent. Tex. Prop. Code § 202.003(a); *Buckner v. Lakes of Somerset Homeowner's Ass'n, Inc.*, 133 S.W.3d 294, 297 (Tex. App.—Fort Worth 2004, pet. denied). But "[n]o construction, no matter how liberal, can construe a property restriction into existence when the covenant is silent as to that limitation." *Tarr*, 556 S.W.3d at 285; *see Hazel v. Lonesome Ranch Prop. Owners Ass'n*, 656 S.W.3d 468, 491 (Tex. App.—El Paso 2022, no pet.) ("[T]o validly limit a property owner's use, a covenant must plainly prohibit the use.").

Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Hazel*, 656 S.W.3d at 491. Our paramount concern when construing restrictive covenants is to give effect to the objective intent of the drafters of the covenant as it is reflected in the language chosen. *Tarr*, 556 S.W.3d at 280. The words in a restrictive covenant "may not be enlarged, extended, stretched[,] or changed by construction." *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987). "If the covenant has a definite or certain meaning, it is unambiguous as a matter of law." *Raman Chandler Props., L.C. v. Caldwell's Creek Homeowner's Ass'n, Inc.*, 178 S.W.3d 384, 391 (Tex. App.—Fort Worth 2005, pet. denied).

A party seeking to enforce a restrictive covenant has the burden at trial of demonstrating that the restriction is valid and enforceable. *Gillebaard v. Bayview Acres Ass'n, Inc.*, 263 S.W.3d 342, 347 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). A trial court's interpretation of restrictive covenants is a legal question that we review de novo. *Raman Chandler Props., L.C*, 178 S.W.3d at 390.

### 3. The Trial Court's Declarations

Through its first issue, HAPA attacks eight different declarations made by the trial court in the amended final judgment. We will address each of the challenged declarations in turn.

### a. The Trial Court's Declaration that the Café and the Lodge Are Airport-Related Businesses Consistent with the Maintenance of the Airfield as a First-Class Private Airfield

In the amended final judgment, the trial court declared that the Café and the Lodge are "airport-related businesses consistent with the maintenance of [the] Airfield as a first-class private airfield."

In its brief, HAPA argues that the trial court erred by declaring that the Café and the Lodge are airport-related commercial businesses. HAPA's complaint is one of factual insufficiency, as HAPA contends that "[t]he credible evidence admitted into evidence is too weak to support the court's finding that [the Café] and [the Lodge] are airport-related commercial businesses consistent with [the] maintenance of [the] Airfield as a first-class private airfield and the finding is so against the great weight and preponderance of the credible evidence contrary to the finding that it should be

14

overturned." Notably, neither "airport-related commercial business" nor "first-class private airfield" is defined in the CCRs.

In addressing this issue, both sides point to the following CCR provisions that relate to the use of an Airfield lot:

> Use of the Silverado Tract and Phase I. [The relevant lots] may only be used for aircraft hangars, general office use, airport related commercial business, and Common Areas related to the use thereof. [HAPA] and Silverado acknowledge that certain Owners of [the relevant lots] are presently using their Lots for other than aircraft hangars, general office use[,] and airport related commercial businesses. With respect thereto, the existing Owners of those Lots shall have the right to continue to operate or use their Lots for their present purposes (i.e., the purposes for which said lots are presently being used as of the date of filing of this Fifth Amendment); however, this right shall be personal to the Owners of said Lots and upon the sale, lease, transfer[,] or other disposition of any nature by the present Owner of such Lot to any other person or entity, such use shall . . . no longer be valid or in accordance with the provisions of this Fifth Amendment, and [HAPA] shall have the right to require the new Owner or user of the Lot, as the case may be, to cease using the Lot for any purpose other than as herein permitted pursuant to this Section 6(c).
>
> . . . .
>
> Uses. All rights to use the Common Areas of [the] Airfield, including but not limited to the runway, are strictly reserved to [HAPA] and shall be restricted in accordance with the operation of a private airfield, with such uses being restricted to the owners of lots . . . and not to any other person or entity . . . . Notwithstanding anything contained in the [CCRs] to the contrary, the Owners of Lots . . . shall have the right to use their Lots for general office use and for all airport related commercial businesses, provided, however, that such uses are consistent with the maintenance of the Property as a first class private airfield.

HAPA points to testimony from numerous witnesses to support its argument that the Café and the Lodge are not airport-related commercial businesses. First,

15

HAPA highlights testimony from its expert witness, Jeffrey Price, a professor of aviation at the Metropolitan State University of Denver. Price stated that he had around thirty years' experience in the aviation industry and that he was "a commercial pilot with an instrument rating and a remote pilot certificate." Price described the Airfield as a "general aviation public use airport." He acknowledged that he did not personally visit the Airfield, stating that he had made observations of it using Google Earth.

As it relates to the Café, Price maintained that the Café was "ill-placed on the [A]irfield" and that it was located near a "hotspot," a location he described as "an area on the airport where an incident of some sort is likely to or has frequently occurred." Price stated that "the location of the restaurant itself is [in] very close proximity to the active runway" and that "there does not seem to be any method to get to the restaurant that would not put somebody driving on a taxiway that an aircraft would also be taxiing on." He also said that "the access to the taxiway is too close for where the restaurant is located" and that it is "too easy for somebody to inadvertently get out to the runway."

Price testified that he had never seen another airport in which "the general public had access to the airfield via its taxiways in order to get to a restaurant." Price maintained that, in his opinion, the Airfield's restaurant should be closed to public access as long as the public had to drive on the taxiways to reach it. Price acknowledged, however, that the public's use of the taxiways was not unique to the

16

Café's customers, noting that because of the way the Airfield is laid out, many lot owners have to use the Airfield's taxiways to reach their locations.

In Price's view, an airport-related business was a business that "serve[d] the airport in some way, shape, or form." He also believed that an airport-related business "really just means" a business that is located on an airport. He indicated that airport businesses are typically classified by their land use as either aeronautical land use or nonaeronautical land use. Nonaeronautical businesses included things like concessions, which he stated were "incidental to the operation of the airport but not essential." Price testified that the Café was a concession. Price acknowledged, however, that "there's nothing that says airport-related business must equal aeronautical business." He said that the Café was an airport-related business "[o]nly in the sense that it's located on an airport and the name of the business is associated with aviation, but it's not essential to the operation of the airport." He testified that the building where the Café is located is not consistent with an aeronautical need of the airport because "[it] provides no service that facilitates aviation."

As it relates to the Lodge, Price said that an event center that holds events for up to sixty people is not necessarily an airport-related business just because it is located at an airport. Price admitted, however, that he did not know where the Lodge was located on the Airfield.

HAPA next points to testimony from another of its experts, Randy Coller.[11] Coller stated that he had been a licensed pilot since 1970, that he had previously managed five airports, and that he had worked as an airport inspector for thirty-seven years. Coller explained that he performed an inspection on the Airfield in 2022 and that he had made a report of his inspection. When talking about his report, Coller stated that he had "remark[ed] that there was a substantial amount of nonaeronautical vehicle traffic going to the restaurant."

Coller testified that he was aware that the only means of ingress and egress to "the restaurant" was via the Airfield's taxiways and opined that this created a dangerous condition. He said that the Café was located at a hotspot, although he acknowledged that the Federal Aviation Administration (FAA) had not designated the area as a hotspot. Coller indicated that it was "not typical for the general public to drive on . . . taxiways to access [a] restaurant." However, he admitted that customers of other businesses located at the Airfield use the Airfield's taxiways to travel around the Airfield. Coller also stated that he was not aware of any accidents between planes and vehicles at the Airfield.

HAPA also points to testimony from several lay witnesses in an attempt to prove that the Café and the Lodge are not "airport-related commercial businesses." John Unangst—a licensed pilot, an Airfield lot owner, and the President of HAPA's

---

[11]HAPA cites to Coller's testimony at a 2023 temporary injunction hearing. A transcript of that hearing was admitted into evidence at trial.

Board—testified that the Café and the Lodge were not airport-related commercial businesses. He stated that the Café was a concession and that it was not required for the operation and maintenance of the Airfield. In his opinion, the events held at the Lodge were not necessary for the operation of the Airfield. Unangst maintained that the operation of the Café and the Lodge were not consistent with the maintenance of the Airfield as a first-class private airfield.[12] He indicated, however, that a first-class private airfield should have a community restroom for pilots, and he acknowledged that if the Café stopped operating, the Airfield would no longer have a community restroom.

Ronald Wasson, a pilot and an Airfield lot owner, stated that the Café was not an airport-related commercial business and that the operation of the Café was not consistent with the maintenance of the Airfield as a first-class private airfield. Wasson also said that the operation of the Lodge as an event center and overnight lodging location was not consistent with the maintenance of the Airfield as a first-class private airfield. Wasson acknowledged, however, that an airport that does not offer restroom facilities is not a first-class airfield.

Mike Olson—a HAPA Board member, an Airfield lot owner, and a pilot—testified that the Café was not an airport-related commercial business. He said that if

---

[12]Unangst testified that, in his view, "a first-class private airfield would be an airfield [where] people . . . can enjoy their properties and use of their aircraft without fear of reprisal or having any undue safety issues or worries that they're going to have a safety issue."

19

the Café were used exclusively for "aviation-related people who are on the airport and have knowledge of airplanes and the risks that go along with [that]," the Café could be an airport-related commercial business. Olson also indicated that the operation of the Café was not consistent with the maintenance of the Airfield as a first-class private airfield. He stated that the Café was located near a hotspot and that he was unaware of any other airfield that had a restaurant open to the general public that was located near a hotspot.

Thomas Boback—a licensed pilot, HAPA Board member, and Airfield lot owner—averred that the Café was not required for the operation of the Airfield. He also maintained that the Café was not an airport-related commercial business and that its operation and location on the Airfield was not consistent with the maintenance of the Airfield as a first-class private airfield. Boback believed that the operation of the Lodge as an event center and an overnight lodging facility and its location on the Airfield were not consistent with the maintenance of the Airfield as a first-class private airfield.[13]

Andrew Duff, a pilot and an Airfield lot owner, testified that the Café was not an airport-related commercial business. He also said that the operation of the Café and the Lodge and their respective locations on the Airfield were not consistent with the maintenance of the Airfield as a first-class private airfield.

---

[13]Boback acknowledged that the CCRs do not define the term "airport-related commercial business," nor do they define the term "first-class private airfield."

Other witnesses, however, suggested that the Café and the Lodge were important to other Airfield lot owners and to those visiting the Airfield. Eric Faulkner, the owner of Southlake Hospitality, stated that in May 2023, approximately eighty percent of the Café's weekday customers resided or worked on the Airfield and that approximately fifty percent of the Café's weekend customers resided or worked on the Airfield. By the time of the August 2024 trial, Faulkner believed that those numbers had changed, noting that the Café had been receiving less customers "off the Airfield." He indicated that around eighty percent of the Café's total customers were comprised of "airport people." Faulkner testified that pilot schools had used the Café for meetings, as had a "senior pilot group." Faulkner stated that feeding pilots and members of the Airfield community was essential to airport operations. According to Faulkner, if the Café were not allowed to operate on the Airfield, pilots and lot owners would have to leave the Airfield to get food, which would necessitate them driving on the Airfield's taxiways.

Ms. Brunson testified that people who live on the Airfield use the Lodge for special events. As an example, she mentioned that an aircraft mechanic had his birthday party at the Lodge, that the Lodge had been used by "FAA officials," and that it had "hosted safety committee meetings." Ms. Brunson maintained that "[a] lot" of the Lodge's customers were people who had an aviation background or who were "fond of general aviation." She stated that several of the Lodge's overnight

21

guests had flown into the Airfield for their visit, although she admitted that the majority of customers had driven into the Airfield.

Ms. Brunson believed that the Lodge was an airport-related commercial business because it "provides a place for a pilot to park his plane and to stay the night." In her opinion, a first-class private airfield would provide a place for food and restrooms, as well as a place for pilots to stay and hangar their airplanes. Ms. Brunson stated that she opened the Lodge after receiving phone calls from out-of-state pilots who wanted to use the Airfield's hangars and who would ask her for information about the closest hotel. She thought "it would be nice to put in an Airbnb where pilots could fly, keep their plane there, do their business, and then take off the next day." Ms. Brunson testified that the Lodge helps maintain the Airfield as a first-class private airfield.

Mr. Brunson acknowledged that the CCRs do not contain a definition of the phrase "airport-related business." In his opinion, the phrase means a business "that supports the primary functions of the airport." He said that the definition would include businesses that "provide a place for people to meet," ones that provide "a place for pilots or visitors to the airport to have a place to use the restroom," and ones that "have a place for [pilots or visitors to the airport] to have refreshments or food." He maintained that the Café was the "heart of the airport," explaining that numerous lots had been bought and sold at the restaurant and that "it was the de facto meeting place for a lot of the respective owners of lots at the airport." Mr.

22

Brunson also indicated that other private airfields utilized a similar design to the Airfield whereby vehicles and airplanes shared roadways and taxiways.

Tim Bero, a lot owner and former Board member, testified that the Café added value to the Airfield and the people who live on the Airfield. He maintained that the Café was an airport-related commercial business, noting that the Airfield needs a place for fuel, a restaurant, and restrooms. Bero said that if the definition of airport-related commercial business meant that the business had to be essential for the operation of the Airfield, he did not think that any business at the Airfield met that definition. Bero also indicated that he had visited multiple airports in other states that utilized a design where visitors had to drive on the airport's taxiways to navigate around the airport.

Forseth, the pilot who runs the flight school at the Airfield, testified that the Café helps the Airfield's "representation" and "prestige." He maintained that the Café was a convenient place for his flight instructors to meet with students and that the operation of the Café improved his enjoyment of the Airfield. Forseth stated that, just as the Café's customers use the Airfield's taxiways to reach the Café, his students use the Airfield's taxiways to reach his hangar.

Philip Perez—a pilot, retired air-traffic controller, and long-time Airfield resident—testified that the Café added "value" to the Airfield, noting that "it gives pilots an opportunity to gather together, to actually interact" and that it helped attract pilots to the Airfield.

23

As noted above, the CCRs do not define the phrase "airport-related commercial business." There does not seem to be any dispute that the Café and the Lodge are "commercial businesses." Rather, the dispute centers around whether they are "airport related." We thus look to the common definitions of the words "airport" and "related" so that we can give effect to the objective intent of the drafters of the language. *See Tarr*, 556 S.W.3d at 280; *see also Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022) ("To determine the common, ordinary meaning of undefined terms used in contracts, statutes, and other legal documents, we typically look first to their dictionary definitions." (internal quotation omitted)); *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017) (orig. proceeding) ("Courts may look to dictionaries to discern the meaning of a commonly used term that the contract does not define.").

"Airport" is defined as "a place from which aircraft operate that usually has paved runways and maintenance facilities and often serves as a terminal." *Airport*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/airport (last visited June 9, 2026). "Related" is defined as "connected by reason of an established or discoverable relation." *Related*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/related (last visited June 9, 2026).

With those definitions in mind, there is sufficient credible evidence to support the trial court's conclusion that the Café and the Lodge are "airport-related commercial businesses consistent with the maintenance of the Airfield as a first-class

private airfield." As recounted above, Faulkner testified that approximately eighty percent of the Café's total customers were people who resided or worked on the Airfield. Numerous witnesses recounted how the Café was a central meeting place for the Airfield and its lot owners, describing how pilots ate there, pilot schools met there, Airfield lots were bought and sold there, and pilots gathered to interact there. Other witnesses described how the Café provided a place for pilots and the general public to use the restroom, something they thought was necessary for the maintenance of the Airfield as a first-class private airfield.[14]

As to the Lodge, as recounted above, Ms. Brunson described how the Lodge had been used for special events by people who resided on the Airfield as well as by "FAA officials" and persons hosting an Airfield "safety committee meeting." She also said that overnight guests had flown into the Airfield to visit the Lodge. Moreover, according to Ms. Brunson, the Lodge provided a place for pilots to park their planes and stay the night, something she indicated was needed for the Airfield to be a first-class private airfield.

Although other witnesses suggested—often in a conclusory fashion—that the Café and the Lodge are not airport-related commercial businesses, given the other

---

[14]Unangst, the President of HAPA's Board, admitted that a first-class private airfield should have a community restroom for pilots and acknowledged that if the Café stopped operating, the Airfield would no longer have a community restroom. Wasson similarly admitted that an airport that does not offer restroom facilities is not a first-class airfield.

evidence demonstrated above, we cannot say that the trial court's finding that the Café and the Lodge are "airport-related" commercial businesses consistent with the maintenance of the Airfield as a first-class private airfield was contrary to the great weight and preponderance of the evidence. *See Pool*, 715 S.W.2d at 635; *Eggemeyer v. Hughes*, 621 S.W.3d 883, 890 (Tex. App.—El Paso 2021, no pet.) (op. on reh'g) (stating that, in the context of a factual-sufficiency review of bench-trial findings, an appellate court "must respect that the trial court as the fact[]finder was the sole judge of the credibility of the witnesses and the weight to be given to their testimony"); *Sunrise Helicopters, Inc. v. Nw. Airport Mgmt., Inc.*, No. 14-99-00274-CV, 2001 WL 253591, at *3–4 (Tex. App.—Houston [14th Dist.] Mar. 15, 2001, pet. denied) (not designated for publication) (rejecting sufficiency challenge to trial court's implied finding that aircraft-part sales constituted "commercial aviation activity" when evidence included airport operator's testimony that he understood the term to mean "anything that could reasonably be associated with aviation" and another witness testified that parts stored in airport hangar had been used in "commercial aircraft activity"); *see also Fantasy Ranch, Inc. v. City of Arlington*, 193 S.W.3d 605, 613 (Tex. App.—Fort Worth 2006, pet. denied) (affirming trial court's declaration, after bench trial, regarding whether cabaret met "conforming use" definition under city's adult-entertainment ordinance based on plain language of term when ordinance did not define term). Accordingly, we hold that there was factually sufficient evidence to support the trial court's declaration that the Café and the Lodge are airport-related

26

commercial businesses consistent with the maintenance of the Airfield as a first-class private airfield. We overrule this part of HAPA's first issue.

### b. The Trial Court's Declaration that Neither the Café Nor the Lodge Is an Annoyance or a Nuisance

In the amended final judgment, the trial court declared that "[n]either the [Lodge] nor [the Café] is an annoyance or nuisance to other Hicks Airfield lot owners." In a three-sentence argument section in its brief, HAPA contends that the trial court erred by making this declaration.[15]

A nuisance is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Crosstex N. Tex. Pipeline, L.P.*,

---

[15]In its entirety, HAPA's argument states: "Lot owners Ron Wasson [citations to reporter's record given]; Thomas Boback [citations to reporter's record given]; Andrew Duff [citations to reporter's record given]; John Unangst, individually and on behalf of HAPA's board [citations to reporter's record given][,] all testified the Hangar Lodge and Café are an annoyance and nuisance, due in part to the businesses['] inviting unknown members of the general public onto the Airfield. The general public driving on active taxiways constitutes an abnormally dangerous activity. *See Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580 (Tex. 2016)." That threadbare argument is wholly lacking in substantive analysis, and accordingly, we hold that HAPA has waived its complaint regarding this challenge due to inadequate briefing. *See* Tex. R. App. P. 38.1(i); *In re J.R.*, No. 02-23-00071-CV, 2024 WL 191211, at *11 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (holding that appellant waived her argument when she failed to provide any substantive analysis in support of it). Nevertheless, in the interest of justice, we will address HAPA's complaint. *See Y.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00342-CV, 2022 WL 17255458, at *3 n.4 (Tex. App.—Austin Nov. 29, 2022, no pet.) (mem. op.) (holding that appellant waived issue on appeal due to inadequate briefing but nevertheless addressing issue in interest of justice).

505 S.W.3d at 593; *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003). To rise to the level of a nuisance, the interference must satisfy two requirements: it must (1) be "substantial" in light of all the circumstances and (2) cause "discomfort or annoyance" that is objectively "unreasonable." *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 595.

The substantiality requirement "sets a minimum threshold that confirms that the law does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbance[s] of every[-]day life in a civilized community even from conduct committed with knowledge that annoyance and inconvenience will result." *Id.* (internal quotation omitted). In determining whether interference is substantial, courts may consider the extent of the interference and how long the interference lasts or how often it recurs. *Id.* at 595–96. As for whether it causes "unreasonable" annoyance, a plaintiff must demonstrate that the effects of the substantial interference are unreasonable, not that the defendant's conduct or land use was unreasonable. *Enter. Crude GP LLC v. Sealy Partners, LLC*, 614 S.W.3d 283, 300 (Tex. App.— Houston [14th Dist.] 2020, no pet.) (citing *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 597). In addition, whether the effects of interference are unreasonable is governed by an objective standard, accounting for numerous circumstance-based factors. *Id.* That determination is generally a question of fact. *Id.*

In support of its argument that the trial court erred by declaring that neither the Café nor the Lodge was an annoyance or a nuisance to other Airfield lot owners,

28

HAPA points to testimony from Wasson, Boback, Duff, and Unangst. The testimony from these individuals regarding whether the Café or the Lodge posed an annoyance or a nuisance was markedly similar.

Wasson testified that the Café's customers caused increased traffic on the Airfield's taxiways and that the increased traffic was annoying. Wasson also said that the use of the Lodge as an event center and overnight lodging facility was annoying, noting that the Lodge "[p]robably" increased traffic on the Airfield's taxiways.

Boback averred that the Café's customers caused an increase in traffic on the Airfield's taxiways and that the increased traffic was bothersome. He similarly stated that when the Lodge hosts events, there is an increase in the amount of traffic on the Airfield's taxiways and that the increased traffic is irritating.

Duff stated that the Café's customers caused an increase in traffic on the Airfield's taxiways and that the increased traffic was annoying. He also testified that the use of the Lodge as an event center and overnight lodging facility was annoying to him as a lot owner. In his opinion, the Beacon's traffic had also annoyed him when it was in operation.

Unangst testified that the increased traffic on the Airfield's taxiways by the Café's customers as well as the Lodge's customers was irritating to him as a property owner. Unangst said that the Café and the Lodge "create an undue additional burden on our taxiways and once in a while a runway." He acknowledged that the additional

29

burden "may be minor" but said that "it's still an increase[d]" burden and substantially interfered with his use and enjoyment of his property.

Other witnesses downplayed the traffic concerns noted by HAPA. Forseth stated that the typical interaction between a vehicle and an airplane on the Airfield's taxiways posed just a "slight annoyance," noting that there is usually a delay of "maybe a couple of seconds" while the vehicle gets out of the airplane's way. In his opinion, most of the traffic issues at the Airfield are caused by Amazon delivery drivers. Forseth further indicated that the Airfield had not experienced a noticeable increase in traffic since the Café opened.[16] He also maintained that the Café was doing a better job than the Beacon had done promoting safety.

Stephen Phy, a crash reconstructionist and former police officer, testified that it would not be difficult for a typical passenger vehicle to get around an aircraft on the taxiway that was primarily used by customers traveling to and from the Café. According to Phy, the pavement of the taxiway is thirty feet wide "edge to edge" and the aprons are fifteen feet wide "between the edge of the taxiway and the hangars" and therefore provide a total of sixty feet of pavement in those areas where there is an apron or a driveway on either side of the taxiway. In his opinion, that is "more than sufficient space for - - a small aircraft and typical passenger vehicle." Phy also indicated that he would not expect there to be a sudden encounter between an aircraft

---

[16]To that end, Unangst testified that the Café was not as busy as the Beacon had been.

and a vehicle on the Airfield's taxiways, noting that he would expect the aircraft to be visible to the vehicle's driver.

While several of the witnesses referenced by HAPA spoke of isolated incidents involving vehicles on the Airfield's taxiways and runaways, most of those incidents involved vehicles being driven by individuals not associated with the Café or the Lodge. For example,

- Wasson mentioned an incident in which one of the Beacon's customers was pulling on the propeller of his airplane while another of the Beacon's customers took photographs.

- Wasson acknowledged that his wife once stopped just short of driving onto the runway, noting that there can be confusion between whether one is driving on a taxiway or the runway.

- Unangst spoke of an incident when one of the Beacon's customers drove onto the runway.

- Boback testified about an incident in which several vehicles left the Café's parking lot at around 11:30 p.m. traveling toward the runway, and one of the vehicles drove on the runway. Boback acknowledged, however, that the Café had closed at either 2:00 p.m. or 3:00 p.m. that day and that he had no reason to believe that the vehicles were driven by the Café's customers.

- Duff testified about an incident involving a vehicle driving on the runway, although he acknowledged that the driver was someone associated with Uber Eats and that he had no knowledge whether the driver had stopped at the Café.[17]

---

[17]The owner of Southlake Hospitality testified that the Café had never used Uber Eats as a delivery service.

31

Based on the above testimony, we hold that there is credible evidence to support the trial court's conclusion that neither the Café nor the Lodge was an "annoyance or a nuisance" to other lot owners, and we will not substitute our judgment for that of the trial court. *See Hall v. Lewis*, 639 S.W.3d 197, 205 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("In a bench trial, the trial court is the sole judge of the witnesses' credibility, and the court may choose to believe one witness over another."); *George Joseph Assets, LLC v. Chenevert*, 557 S.W.3d 755, 765 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (stating that, in assessing the sufficiency of the evidence on review of a judgment following a bench trial, the appellate court "do[es] not act as a factfinder" and "may not pass on the credibility of the witnesses or substitute [its] judgment for that of the factfinder"); *see also Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 609 (noting that "the questions of whether an interference with the use and enjoyment of property is substantial, whether the effects of such an interference on the plaintiffs are unreasonable, whether the defendant intentionally or negligently created the interference, and whether the interference results from abnormally dangerous activities generally present questions of fact" for the factfinder to decide).

The trial court could have determined that the issues caused by the operation of the Café and the Lodge caused, at best, only a minor increase in the Airfield's traffic, something that falls far short of the "substantial" interference and "unreasonable" discomfort or annoyance needed to prove a nuisance claim. *See*

32

*Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 595; *Holubec*, 111 S.W.3d at 37; *see also Dealer Comput. Servs., Inc. v. DCT Hollister Rd, LLC*, 574 S.W.3d 610, 623 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (affirming summary judgment as to nuisance claim in which plaintiff alleged that heavy truck traffic "clog[ged] the streets" and "caused significant deterioration of the infrastructure in the community" because such allegations did not establish that defendant "engaged in abnormally dangerous conduct that created a high risk of serious injury"); *City of Laredo v. R. Vela Exxon, Inc.*, 966 S.W.2d 673, 681 (Tex. App.—San Antonio 1998, pet. denied) (reversing nuisance judgment and holding that although "the diversion of traffic from another designated truck route may have increased the traffic on [the] street, no intentional action by the City caused the traffic congestion" and that rather than being caused by the City's actions, the problem was caused by "the use of the truck route by an ever-increasing number of trucks").

In short, we cannot say that the evidence conclusively established that the Café and the Lodge are an "annoyance or a nuisance" to other lot owners. *See Gunn*, 554 S.W.3d at 658; *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 595; *Holubec*, 111 S.W.3d at 37. Nor can we say that the trial court's finding that the Café and the Lodge are not an "annoyance or a nuisance" was contrary to the great weight and preponderance of the evidence. *See Pool*, 715 S.W.2d at 635; *Crosstex N. Tex. Pipeline, L.P.*, 505 S.W.3d at 595; *Holubec*, 111 S.W.3d at 37. Accordingly, we hold that there

33

was both legally and factually sufficient evidence to support the trial court's declaration.

We overrule this part of HAPA's first issue.

### c. The Trial Court's Declaration that Board Members May Not Serve as Members of the ACC and that No Valid ACC Existed at the Time of the Design and Construction of the Area H Fence

In the amended final judgment, the trial court declared that "HAPA board members may not serve as members of the [ACC] and that no valid [ACC] existed at the time of the design and construction of the safety barrier on Area H." In its brief, HAPA argues that this declaration "has no basis in law or fact." Appellees counter that Property Code Section 209.00505(c)—as it existed at the time of trial[18]— provided the legal basis for the trial court's declaration. *See* Tex. Prop. Code § 209.00505(c).

Chapter 209 of the Property Code is the Texas Residential Property Owners Protection Act. *Id.* § 209.001. As effective at the time of trial, Section 209.00505(c) provides that "[a] person may not be appointed or elected to serve on an architectural review authority if the person is: (1) a current board member; (2) a current board member's spouse; or (3) a person residing in a current board member's household."

---

[18]Section 209.00505(c) has been redesignated and amended as Property Code Section 209.00506. *See* Tex. Prop. Code §§ 209.00505(c), .00506.

*Id.* § 209.00505(c). Section 209.00505 "applies only to a property owners' association that consists of more than 40 lots." *Id.* § 209.00505(b)(1).

A "[p]roperty owners' association" is defined in Chapter 209 as "an incorporated or unincorporated association" that (1) "is designated as the representative of the owners of property in a residential subdivision," (2) "has a membership primarily consisting of the owners of the property covered by the dedicatory instrument for the residential subdivision," and (3) "manages or regulates the residential subdivision for the benefit of the owners of property in the residential subdivision." *Id.* § 209.002(7). A "[r]esidential subdivision" is "a subdivision, planned unit development, townhouse regime, or similar planned development in which all land has been divided into two or more parts and is subject to restrictions that" (1) "limit a majority of the land subject to the dedicatory instruments . . . to residential use for single-family homes, townhomes, or duplexes only"; (2) "are recorded in the real property records of the county in which the residential subdivision is located"; and (3) "require membership in a property owners' association that has authority to impose regular or special assessments on the property in the subdivision." *Id.* § 209.002(9).

HAPA contends that "[t]here is no evidence in the record that [the] Airfield is a residential subdivision, and no party has argued otherwise." Appellees suggest that this argument fails because "numerous issues of the *Flappings* newsletter (HAPA's monthly newsletter) entered into evidence refer to HAPA as a homeowners'

35

association." We have reviewed the *Flappings*[19] newsletters admitted into evidence at trial and have not found any references to HAPA being a homeowners' association.

More importantly, we have found no evidence—nor have Appellees cited us to any evidence—establishing that the Airfield is a "residential subdivision." To that end, we have found no evidence indicating that the Airfield is bound by restrictions that "limit a majority of the land subject to its dedicatory instruments . . . to residential use for single-family homes, townhomes, or duplexes only." *See id.* § 209.002(9)(A). To the contrary, the record reflects that the Airfield is a privately owned, public use airport and that the Airfield's lots are "all zoned commercial." Accordingly, Section 209.00505(c) did not provide the trial court with a basis for declaring that "HAPA board members may not serve as members of the [ACC] and that no valid [ACC] existed at the time of the design and construction of the safety barrier on Area H." Because this was the sole legal basis for the challenged declaration, we reverse the declaration and sustain this part of HAPA's first issue. *See AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 664 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (reversing trial court's declaration that was not supported by evidence).

---

[19]Unangst stated that *Flappings* is an official publication of HAPA.

### d. The Trial Court's Declaration that Rio Concho Is the Assignee of the Airfield with All Rights and Privileges of the Declarant Concerning Area H

In the amended final judgment, the trial court declared that "Rio Concho is the assignee of [the] Airfield's Declarant as to all rights and privileges of the Declarant on Area H as stated in the Original Declaration" and that such rights and privileges "result in HAPA having limited authority over Area H."

Article I, Section 9 of the original CCRs stated:

> The portions of the Property designated by the symbol H shall be maintained, owned and operated by Declarant, its successors or assigns, at their option, as an area for the administration building for [the] Airfield, the sale of fuel . . . for aircraft and motor vehicles . . . , for parking of motor vehicles by Declarant, its agents, customers[,] and other invitees, and/or for any other lawful purpose. The water tank for [the] Airfield will also be maintained in this area.

The "Declarant" listed in the original CCRs was Hicks Airfield, Inc.[20]

In its brief, HAPA argues that Rio Concho is not the assignee of the Declarant's rights concerning Area H, pointing out that the original Declarant was Hicks Airfield, Inc. and that Rio Concho acquired its lot from North Fort Worth Aviation, Inc. HAPA contends that there is no evidence that Hicks Airfield, Inc.'s Declarant rights were ever transferred to Rio Concho.

Appellees respond by arguing that "North Fort Worth Aviation, Inc. became Hicks Airfield, Inc.'s successor as Declarant." To support that proposition, Appellees

---

[20]The original CCRs were signed by Sam G. McCall, Jr., as president of Hicks Airfield, Inc.

point to the "Declaration of Don Davis" that was attached as an exhibit to a summary-judgment motion that was filed by Appellees in the trial court.[21]

Notably, while that declaration is contained in the clerk's record, it was not admitted as an exhibit at trial, so it is not evidence for us to consider. *See Loredo v. Williams*, No. 03-25-00052-CV, 2025 WL 2325166, at *2 (Tex. App.—Austin Aug. 13, 2025, no pet.) (mem. op.) ("Items in the clerk's record . . . are not evidence unless they were admitted as exhibits at trial or judicially noticed by the trial court."); *Guerinot v. Wetherell*, No. 01-12-00194-CV, 2013 WL 2456741, at *5 (Tex. App.—Houston [1st Dist.] June 6, 2013, no pet.) (mem. op.) ("Documents attached to pleadings are not evidence unless they are offered and admitted as evidence by the trial court."); *Nat'l Med. Fin. Servs., Inc. v. Irving Indep. Sch. Dist.*, 150 S.W.3d 901, 905 (Tex. App.—Dallas 2004, no pet.) ("For exhibits to be considered at trial, they must be properly admitted as evidence, even if already attached to pleadings.").

Appellees also point to Davis's testimony at a temporary-injunction hearing to support their position. Portions of Davis's testimony from that hearing were admitted into evidence at trial, and we will consider those portions. Davis testified that he was one of the original developers of the Airfield, that he was the Declarant

---

[21]In that declaration, Davis stated that he was a shareholder of Hicks Airfield, Inc.; that "[i]n the early 1990s, North [Fort Worth] Aviation acquired all of [Hicks Airfield, Inc.'s] assets, becoming the Declarant's assignee and successor, with all rights and privileges assigned under the CCRs"; and that "[i]n June 1995, North [Fort Worth] Aviation sold real property, including Area 'H' to Rio Concho."

for the Airfield, and that he assigned his rights to Area H to Rio Concho. Missing from that testimony is any link from Hicks Aviation, Inc. to North Fort Worth Aviation, Inc. to Rio Concho. Indeed, the testimony fails to mention North Fort Worth Aviation, Inc.—the very entity that sold Rio Concho its lot.[22]

Moreover, other trial evidence does not support Appellees' position. Mr. Brunson acknowledged that the original Declarant was Hicks Airfield, Inc. and that Hicks Airfield, Inc. is a separate entity from North Fort Worth Aviation, Inc. Mr. Brunson admitted that he was unaware of any document whereby Hicks Airfield, Inc. transferred any rights to North Fort Worth Aviation, Inc. While Mr. Brunson maintained that North Fort Worth Aviation, Inc. had become the Declarant when Rio Concho purchased its lot in 1995, he did not know when (or how) North Fort Worth Aviation, Inc. acquired those rights.

Ms. Brunson also acknowledged that Hicks Airfield, Inc. was the original Declarant in the CCRs, and she testified that she did not know whether North Fort Worth Aviation, Inc. had ever been assigned Hicks Airfield, Inc.'s Declarant rights. Moreover, when the Fifth Amendment to the CCRs was executed in 1998—three

_____

[22]Moreover, it is unclear who Davis was speaking of when he stated that he was the Declarant for the Airfield and that he had assigned his rights to Area H to Rio Concho. If Davis was suggesting that he owned the Declarant's rights on an individual basis, it does not explain how Davis obtained the rights from Hicks Airfield, Inc. And if he was suggesting that North Fort Worth Aviation, Inc. owned the Declarant's rights, it similarly does not explain how North Fort Worth Aviation, Inc. obtained the rights from Hicks Airfield, Inc.

years after Rio Concho purchased its lot from North Fort Worth Aviation, Inc.—the Declarant was still listed as Hicks Airfield, Inc. Indeed, Hicks Airfield, Inc. signed a consent document whereby it confirmed and approved the Fifth Amendment. Davis, acting as the president of Hicks Airfield, Inc., signed that consent on its behalf. Ms. Brunson also signed the Fifth Amendment.

Given the foregoing, we hold that there was no evidence for the trial court's declaration that "Rio Concho is the assignee of [the] Airfield's Declarant as to all rights and privileges of the Declarant on Area H as stated in the Original Declaration" and that such rights and privileges "result in HAPA having limited authority over Area H." We thus reverse the trial court's declaration and sustain this part of HAPA's first issue. *See AVCO Corp.*, 251 S.W.3d at 664 (reversing trial court's declaration that was not supported by evidence).

### e. The Trial Court's Declaration that the CCR Signage Restrictions Apply Only to Lots with Hangars or T-Hangars and Not to Area H

In the amended final judgment, the trial court also declared that "the signage restrictions in the CCRs apply only to lots with hangars or T-hangars" and that "[b]ecause Rio Concho's lot, Area H, does not have, and has never had, either type of structure erected on it, such restrictions do not apply to Area H." HAPA seemingly attacks that declaration in three short sentences in its brief. Those sentences read:

> The CCRs First Amendment, Def's_Exh._50, subparagraph J. states: Except as permitted by the association, no signs shall be constructed on the Property. Commercial enterprises may, however, construct a sign

40

indicating the name of the business. RR6_16:20–24. Mr. Brunson agreed Plf's Exh. 35 gave Rio Concho notice Area H was subject to the CCRs. RRVol 5_142:7–11.

The Texas Rules of Appellate Procedure require adequate briefing, and the failure to comply with those rules can result in waiver. *See* Tex. R. App. P. 38.1; *Bertucci v. Watkins*, 709 S.W.3d 534, 541 (Tex. 2025); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 500 (Tex. 2015). Texas Rule of Appellate Procedure 38.1 requires that an appellant's brief contain, among other things, a clear and concise argument for the contentions made, with appropriate citations to legal authority and to the record. Tex. R. App. P. 38.1(i); *see ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (recognizing that "[t]he Texas Rules of Appellate Procedure require adequate briefing"). Merely uttering brief, conclusory statements unsupported by citation to legal authorities does not satisfy briefing requirements. *Jimison v. MAEDC-Hulen Bend Senior Cmty., L.P.*, No. 02-23-00206-CV, 2024 WL 3282544, at *8 (Tex. App.—Fort Worth July 3, 2024, no pet.) (mem. op.); *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). Indeed, "[f]ailure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint." *Valadez*, 238 S.W.3d at 845.

Although we construe appellate briefs liberally and require only substantial compliance with the briefing rules, *see* Tex. R. App. P. 38.9; *Horton v. Stovall*, 591 S.W.3d 567, 569–70 (Tex. 2019), "[w]e are not responsible for identifying possible trial court error, searching the record for facts favorable to a party's position, or

41

conducting legal research to support a party's contentions." *In re J.O.A.M.*, No. 01-23-00691-CV, 2024 WL 1169432, at *23 (Tex. App.—Houston [1st Dist.] Mar. 19, 2024, no pet.) (mem. op.). Nor are we required to "become advocates for a particular litigant" by performing our own research and developing arguments for that litigant. *Perkins v. Hicks*, No. 02-19-00207-CV, 2020 WL 7393334, at *1 (Tex. App.—Fort Worth Dec. 17, 2020, no pet.) (per curiam) (mem. op.) (quoting *Tello v. Bank One, N.A.*, 218 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.)); *see Ihnfeldt v. Reagan*, No. 02-14-00220-CV, 2016 WL 7010922, at *9 (Tex. App.—Fort Worth Dec. 1, 2016, pet. denied) (mem. op.) ("It is an appellant's burden to discuss his assertions of error, and appellate courts have no duty—or even the right—to perform an independent review of the record and the applicable law to determine whether there was error."). "Were we to engage in such activities, we would be abandoning our role as judges and taking on the role of advocate for that party." *J.O.A.M.*, 2024 WL 1169432, at *23 (citing *Valadez*, 238 S.W.3d at 845).

Having reviewed HAPA's scant reference to this issue, we cannot ascertain the substance of its complaint. In the complained-of declaration, the trial court found that "the signage restrictions in the CCRs apply only to lots with hangars or T-hangars" and that such restrictions do not apply to Rio Concho because Area H does not have a hangar or a T-hangar. Yet in its three short sentences criticizing the trial court's declaration, HAPA does not discuss whether the signage restrictions apply only to lots with hangars or T-hangars, does not address whether Area H has a hangar

42

or a T-hangar,[23] and does not cite to any legal authority. We thus hold that HAPA has not provided substantive analysis of the legal issue presented and that it has waived this issue due to inadequate briefing. *See J.O.A.M.*, 2024 WL 1169432, at *23; *Valadez*, 238 S.W.3d at 845; *see also In re Guardianship of Onyebuchi*, No. 02-13-00401-CV, 2014 WL 4463114, at *2 (Tex. App.—Fort Worth Sept. 11, 2014, pet. denied) (mem. op.) (recognizing that "arguments raised on appeal that are unsupported by analysis or appropriate citation to legal authority and to the record present nothing for us to review"); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) (holding that "[f]ailure to cite applicable authority or provide substantive analysis waives an issue on appeal").

We overrule this part of HAPA's first issue.

### f. The Trial Court's Declaration that HAPA Abandoned the Restriction that Lots Must Be Used Only for Aircraft Hangars, General Office Use, or Airport-Related Commercial Businesses

In the amended final judgment, the trial court declared that "HAPA [had] abandoned its restriction that lots must be used only for aircraft hangars, general office use, or airport-related commercial businesses." HAPA argues that the trial court erred by making this declaration, pointing out that the CCRs contain a nonwaiver provision and that, in any event, the trial evidence did not establish that HAPA had abandoned its ability to enforce that restriction. As to the nonwaiver

---

[23]Multiple witnesses at trial testified that Area H did not contain a hangar.

provision, the CCRs state that the "failure by [HAPA] or any Owner to enforce any covenants, conditions[,] and restrictions herein contained shall in no event be deemed a waiver of the right to do so thereafter."

Two areas of law converge in our analysis of this issue—first, the law concerning whether a restrictive covenant may be abandoned, and second, the law concerning whether a nonwaiver clause may be waived. As to the first area, in the seminal case of *Cowling v. Colligan*, the Texas Supreme Court declared that a court may refuse to enforce a restrictive covenant "because of the acquiescence of the lot owners in such substantial violations within the restricted area as to amount to an abandonment of the covenant or a waiver of the right to enforce it." 312 S.W.2d 946, 945 (Tex. 1958). "Cases subsequent to *Cowling* illustrate that, in the context of restrictive covenants, the concepts of abandonment and waiver go hand in hand—a finding that a restriction has been abandoned is essentially the same, and must have the same evidentiary support, as a finding that the right to enforce the covenant has been waived." *Musgrove v. Westridge Street Partners I, LLC*, No. 2-07-281-CV, 2009 WL 976010, at *3 (Tex. App.—Fort Worth Apr. 9, 2009, pet. denied) (per curiam) (mem. op.) (collecting cases).

As we noted in *Musgrove*, "[t]o establish the affirmative defense of abandonment or waiver, the defendant 'must prove that the violations are so great as to lead the mind of the average man to reasonably conclude that the restriction in question has been abandoned.'" *Id.* (quoting *Tanglewood Homes Ass'n, Inc. v. Henke*,

44

728 S.W.2d 39, 43 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)). Courts assess the question of waiver in this context by weighing the number, nature, and severity of then-existing violations; any prior acts of enforcement; and whether it is still possible to realize to a substantial degree the benefits intended through the covenant. *Id.*; *Tanglewood Homes Ass'n, Inc.*, 728 S.W.2d at 43.

As to the second area of law—the area concerning whether a nonwaiver clause may itself be waived—we begin by noting that "[w]aiver is 'an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d 689, 699 (Tex. 2025) (quoting *Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 334 (Tex. 2020)). It is a question of intent, examining whether a party's conduct, in light of the surrounding facts and circumstances, is unequivocally inconsistent with claiming a right. *Id.* As noted by the Texas Supreme Court, "Given Texas's strong public policy favoring freedom of contract, there can be no doubt that, as a general proposition, nonwaiver provisions are binding and enforceable." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017). Indeed, "[n]onwaiver provisions have been enforced in the context of restrictive covenants." *Vance v. Popkowski*, 534 S.W.3d 474, 479 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (collecting cases).

In *Musgrove*, we addressed the issue of whether a nonwaiver provision in a restrictive covenant may be waived. *See Musgrove*, 2009 WL 976010, at *4. We stated

45

that we had not uncovered any Texas case that specifically addressed the question of "whether a nonwaiver provision in a restrictive covenant is waived when the restrictions have been abandoned." *Id.* We agreed with the holding of an Arizona court of appeals on the issue, which concluded that a "non[]waiver provision would be ineffective if a complete abandonment of the *entire set of [r]estrictions* has occurred." *Id.* (quoting *Burke v. Voicestream Wireless Corp. II*, 87 P.3d 81, 87 (Ariz. Ct. App. 2004)) (emphasis added). We held that to decide whether a trial court erred by holding that a nonwaiver provision had been waived, we must examine the record "to see if there is evidence of . . . violations so pervasive that the trial court could reasonably have determined that the fundamental character of the neighborhood had been destroyed." *Id.*

Here, Appellees argue that HAPA has waived its ability to enforce the restriction that lots must be used only for "aircraft hangars, general office use, or airport-related commercial businesses" because "it acquiesced to a restaurant being operated on the property for 25 years." That argument, however, necessarily assumes that the Café (or the Beacon before it) is not an "airport-related commercial business" within the meaning of the CCRs. The trial court found that the Café is an "airport-related commercial business," and we have affirmed that finding. Thus, the mere fact that HAPA allowed a restaurant to operate so long without interference at the Café's location is no evidence of abandonment of HAPA's ability to enforce restrictions against non-"airport-related commercial businesses."

46

Appellees also point to Boback's testimony that two- to three-dozen "businesses or commercial businesses" operate at the Airfield. But Boback's testimony did not establish whether the two- to three-dozen businesses were "airport-related commercial businesses" or non-"airport-related commercial businesses."[24] And, of course, if the businesses were "airport-related commercial businesses," HAPA would have no need to enforce its restriction against the use of the lots for non-"airport-related commercial business."

Appellees next point to testimony that certain businesses have been allowed to operate at the Airfield, including an auto-body shop, a repair shop, a firearm manufacturer, an industrial manufacturer, and short-term rental properties. We have reviewed the testimony cited by Appellees. While witnesses did testify that the Airfield included such businesses, there was virtually no testimony to establish what these businesses did, whether they could be considered "airport-related commercial businesses," and whether HAPA had attempted to enforce any CCR provisions against them.

Moreover, there was testimony that the Airfield contained 452 lots. So, even if the evidence reflected that a handful of non-"airport-related commercial businesses"

---

[24]Appellees similarly argue in their brief that "a variety of commercial businesses have opened and operated at [the] Airfield over the past 25 years." But the number of commercial businesses that have operated at the Airfield is not necessarily the same as the number of non-"airport-related commercial businesses" that have operated at the Airfield.

were allowed to freely operate at the Airfield, such isolated occurrences would fail to demonstrate that HAPA abandoned its ability to enforce the provision requiring that lots be used only for "aircraft hangars, general office use, or airport-related commercial businesses."[25] *See City of Houston v. Revels*, No. 14-99-00139-CV, 2001 WL 699546, at *2 (Tex. App.—Houston [14th Dist.] June 21, 2001, pet. denied) (not designated for publication) ("Texas courts have found that violation rates ranging from 1.9% to 8.9% were not sufficient to support waiver and abandonment, while a violation rate of nearly 27% was sufficient to find waiver and abandonment." (footnote omitted)); *Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) ("Finkelstein's affidavit proof of two fronting violations reflects, at best, isolated instances of breach of the restriction. We hold that they are insufficient as a matter of law in number, nature, or severity to constitute waiver of the restrictive covenant's benefits and enforceability.").

And more importantly, for the nonwaiver provision to have been waived, there must be "evidence of . . . violations so pervasive that the trial court could reasonably

---

[25]The trial court admitted a list compiled by Ms. Brunson of forty-nine businesses ostensibly operating at the Airfield. That list included businesses such as "Alliance Awards," "Industrial Shredders," "TNW Firearms [M]anufacturing," "Auto Maintenance Shop," "Lab Resources Medical Equipment," "Stated Value Ramsey Auto Restoration," "Ray Taggert – Accounting Firm," and "Trevor Howell Berkshire Hathaway HomeServices Ally Real Estate." Ms. Brunson acknowledged that by the time of trial, the list was "a year and a half old" and several of the businesses had changed. She also stated that she had not visited the businesses to confirm the nature of the businesses.

have determined that the fundamental character of the [Airfield] had been destroyed" and that the "entire set" of restrictions had been abandoned. *See Musgrove*, 2009 WL 976010, at *4. The scant, cursory trial evidence regarding abandonment does not come close to reaching this threshold. *See Location, Location, Location, Ltd. v. Home Depot USA, Inc.*, No. 07-21-00036-CV, 2022 WL 215131, at *4 (Tex. App.—Amarillo Jan. 25, 2022, no pet.) (mem. op.) ("To establish waiver by abandonment of a restrictive covenant running with the land, where there is a nonwaiver provision, a property owner must prove that the existing violations are so great and the violations so pervasive, that they have destroyed the fundamental purpose of the restrictions and have caused the average person to conclude that the *entire set of restrictions* in question have been abandoned." (emphasis in original)); *Vance*, 534 S.W.3d at 481 (reversing jury finding that deed restrictions had been abandoned when evidence did not conclusively establish "complete abandonment of the entire set of [the deed restrictions] so pervasive that the fundamental character of the neighborhood was destroyed").

Given the foregoing, we hold that the trial court did not have an evidentiary basis for declaring that "HAPA [had] abandoned its restriction that lots must be used only for aircraft hangars, general office use, or airport-related commercial businesses." We thus reverse the trial court's declaration and sustain this part of HAPA's first issue. *See Location, Location, Location, Ltd.*, 2022 WL 215131, at *4; *Vance*, 534 S.W.3d at 481; *Musgrove*, 2009 WL 976010, at *4.

49

### g. The Trial Court's Declaration that HAPA Interpreted and Applied the CCRs in an Arbitrary, Capricious, and Discriminatory Manner Toward Rio Concho, Southlake Hospitality, and Barbie Land

In the amended final judgment, the trial court declared that "HAPA has interpreted and applied the CCRs in an arbitrary, capricious, and discriminatory manner toward Rio Concho, Southlake [Hospitality], and Barbie Land."[26]

In its brief, HAPA argues that it did not interpret and apply the CCRs in an arbitrary, capricious, and discriminatory manner toward Rio Concho, Southlake Hospitality, or Barbie Land, pointing to the fact that it had issued violation notices to entities other than Rio Concho, Southlake Hospitality, and Barbie Land. Specifically, HAPA cites testimony from Bero—a lot owner and former Board member[27]—who stated that the Board had sent violation notices to businesses that were not considered to be "airport-related commercial businesses" when he was serving on the Board. Bero, however, could not identify any of the businesses who had been sent these violation notices.[28]

---

[26]Pursuant to Section 202.004(a) of the Property Code, "An exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory." Tex. Prop. Code § 202.004(a).

[27]Bero indicated that he was on the Board around 2021.

[28]Bero testified that he was aware that after he left the Board, the Board had sent violation notices to other businesses stating that the businesses were in violation

Moreover, Bero stated that "it was very selective on who the [B]oard would send the letters to" and that the violation notices were "not done per the CCRs or anything else" but that they were "done on who you like and who you're politically connected to." Bero also testified that the Board had a "vendetta against Rio Concho."[29] He further opined that he "felt that the power of the [B]oard was being manipulated for those that were friends of the [B]oard," that "the [B]oard members themselves that were in violation [went] after other people that [were] members," and that the violation notices were the result of "selective persecution by the [B]oard against certain people." Indeed, Bero stated that while he served on the Board, the Board's "main focus was ex[]acting a vendetta against Rio Concho" and that exacting that vendetta "was most of what [the] meetings were about."

HAPA also points to testimony from Ms. Brunson to demonstrate that HAPA had issued other violation notices. Ms. Brunson testified that businesses other than ones associated with her had been sent violation notices by HAPA, including notices to two individuals and one entity. However, Ms. Brunson did not offer any explanation as to why those violation notices were sent, and she stated that those

_____

of the CCRs because they were not "airport-related commercial businesses." Bero, however, did not state when those notices were sent, and he did not identify which businesses were sent the notices other than one of them being "a mechanic shop next to [his] building."

[29]Multiple Board members testified that they did not have a personal vendetta against Appellees.

51

violation notices had only been sent in the "last couple of months." Ms. Brunson opined that she felt singled out when Barbie Land received its violation notice because she was "not aware of anyone else having received a notice of violation for these type of violations of operating a nonairport-related business." Ms. Brunson maintained that the Board was unfairly targeting Rio Concho. Thus, Ms. Brunson's testimony does not support HAPA's argument.

HAPA suggests that its actions with respect to Rio Concho, Southlake Hospitality, and Barbie Land were warranted because those entities are operating in an area "adjacent to a hotspot" on the Airfield. But the record reflects that the Beacon had operated in the same location and that it had not received any violation notice from the Board. Moreover, while several witnesses stated that Area H was near a hotspot, witnesses also confirmed that the location had not been designated as a hotspot on any aeronautical charts for the Airfield. And while some witnesses testified about traffic incidents involving customers of the Café and the Lodge, the traffic incidents were not unique to customers of those businesses. To that end, witnesses testified about many other traffic incidents at the Airfield involving a myriad of other persons and businesses, such as the Beacon's customers, Amazon delivery drivers, Uber Eats drivers, and others.

Having reviewed the record, we hold that there is credible evidence to support the trial court's conclusion that HAPA interpreted and applied the CCRs in an arbitrary, capricious, and discriminatory manner toward Rio Concho, Southlake

Hospitality, and Barbie Land. Bero's testimony in particular supported the trial court's conclusion, and it was the trial court's prerogative to believe him; we will not substitute our judgment for the trial court. *See Dao v. Mission Bend Homeowners Ass'n Inc.*, 667 S.W.3d 304, 318 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (reviewing trial court's ruling with respect to whether homeowners' association acted in arbitrary, capricious, and discriminatory manner, and noting that factfinder was the sole judge of witness credibility and the weight to be given their testimony).

Moreover, the record reflects that the Beacon was allowed to operate as a restaurant in the same location as the Café without any interference from the Board. *See Sierra Crest Homeowners Ass'n, Inc. v. Villalobos*, 527 S.W.3d 235, 248 (Tex. App.—El Paso 2016, no pet.) (affirming jury finding that homeowners' association acted arbitrarily, capriciously, and discriminatorily and noting that "[e]ven the cold words on the written page scream animosity" between association and homeowner); *Nolan v. Hunter*, No. 04-13-00072-CV, 2013 WL 5431050, at *4 (Tex. App.—San Antonio Sept. 25, 2013, no pet.) (mem. op.) (affirming jury finding that architectural control committee had acted in an arbitrary, capricious, and discriminatory manner by rejecting homeowner's plan for wooden privacy fence when other similar wooden privacy fences were allowed in the subdivision).

In sum, we cannot say that the evidence conclusively established that HAPA did not act arbitrarily, capriciously, or in a discriminatory manner toward Rio Concho, Southlake Hospitality, or Barbie Land. *See Gunn*, 554 S.W.3d at 658; *Sierra Crest*

*Homeowners Ass'n, Inc.*, 527 S.W.3d at 248; *Nolan*, 2013 WL 5431050, at *4. Nor can we say that the trial court's finding that HAPA so acted was contrary to the great weight and preponderance of the evidence. *See Pool*, 715 S.W.2d at 635; *Sierra Crest Homeowners Ass'n, Inc.*, 527 S.W.3d at 248; *Nolan*, 2013 WL 5431050, at *4. Accordingly, we hold that there was both legally and factually sufficient evidence to support the trial court's declaration that HAPA interpreted and applied the CCRs in an arbitrary, capricious, and discriminatory manner toward Rio Concho, Southlake Hospitality, and Barbie Land.

We overrule this part of HAPA's first issue.

### h. The Trial Court's Declaration that the CCRs Permit Tenants to Operate Businesses on the Airfield and that HAPA May Not Exclude Customers and Tenants

In the amended final judgment, the trial court declared that "the CCRs in effect permit the use of [the] Airfield lots for aircraft hangars, general office use, and all airport-related commercial businesses" and that "[t]he CCRs do not grant HAPA the authority to exclude the customers, invitees, and guests of [the] Airfield's lot owners and tenants."

HAPA attacks this declaration in one paragraph in its brief. It argues that the trial court erred by making the declaration because "[n]o provision in the CCRs exist which permit a tenant to own or operate a business on the Airfield." HAPA points to the Fifth Amendment to the CCRs, which provides, in pertinent part, that the subject

54

property "may only be used for aircraft hangars, general office use, airport[-]related commercial business, and Common Areas related to the use thereof."

The Fifth Amendment goes on to say that HAPA acknowledged that certain lot owners were then "presently using their Lots for other than aircraft hangars, general office use[,] and airport[-]related commercial business" and that "the existing Owners of those Lots shall have the right to continue to operate or use their Lots for their present purposes." However, "this right shall be personal to the Owners of said Lots and upon the sale, lease, transfer[,] or other disposition of any nature by the present Owner of such Lot . . . , such use shall . . . no longer be valid."

According to HAPA, this last provision—that "this right shall be personal" and that it should no longer be valid upon the lease of the lot—somehow equates to a blanket prohibition on a tenant's ability to operate a business on the Airfield. We disagree. That section of the Fifth Amendment begins by specifically providing that a lot may be used for an "airport[-]related commercial business." The section then mentions that some lot owners had been using their lots for things other than aircraft hangars, general office use, and airport-related commercial businesses, and notes that those lot owners shall "have the right" to continue using the lots for their then-"present purposes." However, the provision states that "this right"—i.e., the right of the lot owners to use their lots for something other than aircraft hangars, general office use, and airport-related commercial businesses—"shall be personal" and no longer valid upon the sale or lease of the lot. Thus, the context of the Fifth

55

Amendment confirms that the language stating that "this right shall be personal" was not speaking of the right to use a lot for airport-related commercial businesses but rather was speaking of the right of lot owners who had been using their lots for other than aircraft hangars, general office use, and airport-related commercial business to continue doing so.

Having reviewed the CCRs, we have found no provision in them that prohibits a tenant from using its lot for aircraft hangars, general office use, or an airport-related commercial business. Indeed, Unangst—the Board's President—was asked at trial whether there was "a prohibition on leasing property at [the Airfield]." Unangst responded, "There is not." And absent such a provision, the Airfield lot owners are free to lease their lots. *See Calcasieu Lumber Co. v. Harris*, 13 S.W. 453, 454 (Tex. 1890) ("The ownership of land, when the estate is a fee, carries with it the right to use the land in any manner not hurtful to others; and the right to lease it to others, and therefore derive profit, is an incident of such ownership."); *City of Grapevine v. Muns*, 651 S.W.3d 317, 346 (Tex. App.—Fort Worth 2021, no pet.) (op. on reh'g) ("Property ownership includes the right to lease to others."); *Zaatari v. City of Austin*, 615 S.W.3d 172, 190 (Tex. App.—Austin 2019, pet denied) ("The ability to lease property is a fundamental privilege of property ownership.").

The trial court did not err by declaring that "the CCRs in effect permit the use of [the] Airfield lots for aircraft hangars, general office use, and all airport-related commercial businesses" and that "[t]he CCRs do not grant HAPA the authority to

exclude the customers, invitees, and guests of [the] Airfield's lot owners and tenants."

*See Calcasieu Lumber Co.*, 13 S.W. at 454; *City of Grapevine*, 651 S.W.3d at 346; *Zaatari*, 615 S.W.3d at 190.

We overrule this final part of HAPA's first issue.

## B. HAPA's Complaints Regarding the Permanent Injunction

In its second issue, HAPA argues that the trial court erred by issuing its permanent injunction.

### 1. Standard of Review

We review a trial court's decision to grant a permanent injunction for an abuse of discretion. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998); *Gilbreath v. Horan*, 682 S.W.3d 454, 542 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (op. on reh'g). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). When a trial court grants a permanent injunction that is not supported by the pleadings or the evidence, the trial court abuses its discretion. *Gilbreath*, 682 S.W.3d at 543 (citing *Webb v. Glennbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 391 (Tex. App.—Dallas 2009, no pet.) (op. on reh'g)). On the other hand, there is no abuse of discretion if the trial court heard conflicting evidence and there is evidence in the record that reasonably supports the trial court's decision. *Id.* We may

not substitute our own judgment for the trial court's judgment on matters within the trial court's discretion. *Id.*

## 2. Enjoining HAPA to Perform a Traffic Safety Study

In the amended final judgment, the trial court permanently enjoined HAPA by ordering it "to undertake a traffic safety study conducted by a qualified firm to recommend changes designed to prevent land vehicles from making dangerous incursions onto the runway." In its brief, HAPA argues that the trial court abused its discretion by enjoining it to undertake a traffic safety study because Appellees' pleadings did not seek that relief.

Under Texas law, a trial court cannot issue a permanent injunction granting relief that is not requested in a party's pleadings. *Holubec*, 111 S.W.3d at 40; *Livingston v. Livingston*, 537 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Indeed, "whe[n] the injunctive relief granted exceeds the relief requested by the applicant in the petition, the trial court exceeds its jurisdiction." *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.).

Here, Appellees' pleadings did not contain any request for injunctive relief pertaining to a traffic safety study. Accordingly, the trial court was without authority to make any injunction concerning a traffic safety study, and it abused its discretion by issuing such an injunction. *See Holubec*, 111 S.W.3d at 40; *Gilbreath*, 682 S.W.3d at 543; *Livingston*, 537 S.W.3d at 588; *see also Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 223 n.42 (Tex. App.—Fort Worth 2021, no pet.) ("Because [the appellee] did not

request an injunction compelling [the appellant] to grant [the doctor] ICU privileges, the trial court could not issue the temporary injunction."); *Harbor Perfusion, Inc.*, 45 S.W.3d at 718 (holding that the trial court exceeded its jurisdiction by entering any injunctive relief beyond enjoining appellant from enforcing a covenant not to compete when appellee's petition requested only that appellant be enjoined from enforcing said covenant). We sustain this part of HAPA's second issue, and we reverse the portion of the amended final judgment containing injunctive relief relating to the traffic safety study.[30]

---

[30]Within HAPA's discussion of its second issue—its issue concerning the trial court's issuance of a permanent injunction—HAPA devotes two pages to arguing that "[n]o membership vote is required for the [B]oard [to] make the Airfield's gates access controlled." It is unclear, however, what portion of the trial court's amended final judgment is being attacked by this complaint. HAPA does not point to any portion of the amended final judgment or any other ruling by the trial court in its discussion of this argument. We have reviewed the trial court's permanent injunction, and we have found no injunction within it regarding a membership vote. Moreover, HAPA does not explain how its argument regarding the membership vote would necessitate the reversal of some other aspect of the trial court's amended final judgment.

Accordingly, to the extent that HAPA intended for its discussion of membership voting on access control to raise a separate appellate issue, we hold that HAPA has inadequately briefed this portion of its second issue. *See* Tex. R. App. P. 38.1(i); *Valadez*, 238 S.W.3d at 845; *see also In re J.D.*, No. 02-24-00515-CV, 2025 WL 2810523, at *3 (Tex. App.—Fort Worth Oct. 2, 2025, no pet.) (mem. op.) (holding that appellant inadequately briefed appellate issue when she did not provide record references to support her complaint and failed to provide any explanation as to how her complaint would necessitate a reversal of trial court's order); *Huey*, 200 S.W.3d at 854 (holding that failure to provide substantive analysis waived issue on appeal).

59

### 3. The Permanent Injunction Against HAPA

In the amended final judgment, the trial court permanently enjoined HAPA from "asserting, sending notices, or assessing fines based on allegations that Rio Concho or Southlake [Hospitality] violated the CCRs by permitting unapproved signage on Area H, erecting all current additions and improvements to the former administration building on Area H, and constructing the safety barrier on Area H."

In its brief, HAPA argues that this injunction was improperly granted because "Rio Concho was never assigned [the] Declarant's (Hicks Airfield, Inc.['s]) rights via its purchase from North Fort Worth Aviation, Inc." In response, Appellees point to their previous argument that Rio Concho is the assignee of the Declarant's rights to Area H. Thus, both parties seem to agree that our disposition of this issue hinges on one we have already addressed: our holding that the trial court erred by declaring that "Rio Concho is the assignee of [the] Airfield's Declarant as to all rights and privileges of the Declarant on Area H as stated in the Original Declaration" and that such rights and privileges "result in HAPA having limited authority over Area H." *See supra* Section III.A.3.d.

Because we have held that the trial court erred by making such a declaration, we likewise hold that the trial court abused its discretion by entering this permanent injunction. We sustain this part of HAPA's second issue, and we reverse the portion of the amended final judgment permanently enjoining HAPA from "asserting, sending notices, or assessing fines based on allegations that Rio Concho or Southlake

60

[Hospitality] violated the CCRs by permitting unapproved signage on Area H, erecting all current additions and improvements to the former administration building on Area H, and constructing the safety barrier on Area H."

## C. HAPA's Complaints Regarding the Trial Court's Findings of Tortious Interference and Breach of Fiduciary Duty

In its third issue, HAPA argues that the trial court erred by finding that it had tortiously interfered with contracts between Rio Concho and Southlake Hospitality and between Barbie Land and its customers. HAPA also argues that the trial court erred by finding that it had breached fiduciary duties owed to Rio Concho and Barbie Land.

### 1. Tortious Interference

The elements of a tortious-interference claim are (1) the existence of a contract subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) the act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Inwood Nat'l Bank v. Fagin*, 706 S.W.3d 342, 347 (Tex. 2025).

Among other arguments relating to the trial court's tortious-interference finding, HAPA contends that "there was no evidence presented to support a damage award to Rio Concho of $34,276.00, or even any means of calculating this sum, or

that Barbie Land suffered $500.00 in damages."[31]  Appellees do not respond to this in their brief; they say nothing with respect to the evidence that Rio Concho suffered $34,276 in damages or that Barbie Land suffered $500 in damages as a result of HAPA's tortious interference.[32]

We have scoured the record looking for evidence to support the trial court's awards of damages stemming from HAPA's alleged tortious interference, but we have found no such evidence.  The record reveals that Rio Concho had a lease with Southlake Hospitality allowing Southlake Hospitality to operate the Café.  But the record does not indicate that Rio Concho suffered damages—much less $34,276 in damages—pertaining to HAPA's alleged interference with that lease.[33]  Faulkner—Southlake Hospitality's owner—testified that he had not terminated the lease with Rio Concho and that he had no intention of terminating the lease.  Ms. Brunson similarly

---

[31]This is a legal-sufficiency challenge.  As noted above, we may sustain a legal-sufficiency challenge only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.  *Gunn*, 554 S.W.3d at 658; *see supra* Section III.A.1.

[32]In its reply brief, HAPA points out that Appellees' brief fails to address the evidence pertaining to the trial court's awards of damages stemming from HAPA's alleged tortious interference.  Even when Appellees later filed a sur-reply, the sur-reply still did not address the evidence pertaining to damages.

[33]Faulkner testified that Southlake Hospitality paid the same amount of rent to Rio Concho both before and after the South Gate became subject to a gate access restriction.

testified that Rio Concho had not received any notice that Southlake Hospitality intended to terminate the lease. Further, Faulkner testified that he had an agreement with Rio Concho that neither Southlake Hospitality nor Rio Concho would seek compensation from each other if either decided to terminate the lease.

As to Barbie Land's damages, the record does not contain evidence of any contract that Barbie Land had with a customer that was interfered with by HAPA, much less any evidence to support the $500 awarded to Barbie Land.

Having found no evidence to support the trial court's awards of damages for tortious interference—and having not been pointed to any such evidence by Appellees—we must reverse the trial court's awards of damages stemming from HAPA's tortious interference and enter a take-nothing judgment on Appellees' tortious-interference claims.[34] *See id.*; *see also Martin v. Beitler*, No. 03-13-00605-CV, 2015 WL 4197042, at *5–6 (Tex. App.—Austin July 7, 2015, no pet.) (mem. op.) (reversing jury's awards of damages for tortious interference when there was no evidence to support the awards).

---

[34]Because HAPA's legal-sufficiency argument regarding damages is dispositive of this issue, we need not address HAPA's additional arguments pertaining to the trial court's tortious-interference finding. *See* Tex. R. App. P. 47.1.

## 2. Breach of Fiduciary Duty

The elements of a breach-of-fiduciary-duty claim are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

HAPA contends that "[t]here was no evidence that Rio Concho suffered $26,000 in damages or that Barbie Land suffered $16,000.00 in damages for HAPA's alleged breach of fiduciary duty."[35]  Again, Appellees do not respond to this portion of HAPA's issue.[36]

Again, we have searched the record looking for evidence to support the trial court's awards of damages stemming from HAPA's alleged breach of fiduciary duty, but we have found no such evidence.  The record does not show that Rio Concho suffered any damages—let alone $26,000 in damages—as a result of HAPA's breach of fiduciary duty.  Further, the record does not show that Barbie Land suffered any damages—let alone $16,000 in damages—as a result of HAPA's breach of fiduciary duty.

---

[35]This is a legal-sufficiency challenge, and we will review it under the legal-sufficiency standards discussed above.  *See Gunn*, 554 S.W.3d at 658; *supra* Section III.A.1; *supra* note 31.

[36]In its reply brief, HAPA points out that Appellees' brief fails to address the evidence pertaining to the trial court's awards of damages stemming from HAPA's alleged breach of fiduciary duty.  But again, Appellees' sur-reply still did not address the evidence pertaining to damages.

Having found no evidence to support the trial court's awards of damages for breach of fiduciary duty—and having not been pointed to any such evidence by Appellees—we must reverse the trial court's awards of damages stemming from HAPA's breach of fiduciary duty and enter a take-nothing judgment on Appellees' breach-of-fiduciary-duty claims.[37] *See First United Pentecostal Church of Beaumont*, 514 S.W.3d at 220; *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (holding evidence legally insufficient to support jury's awards for breach of fiduciary duty).

We sustain HAPA's third issue.

## D. HAPA's Complaints Regarding the Trial Court's Findings of Fact and Conclusions of Law

In its fourth issue, HAPA argues that the trial court erred by making certain findings of fact and conclusions of law. More specifically, HAPA argues that there is insufficient evidence to support twenty-seven of the trial court's findings of fact[38] and that we should review twenty of the trial court's conclusions of law de novo because the conclusions drawn from the facts are incorrect.[39]

---

[37]Because HAPA's legal-sufficiency argument regarding damages is dispositive of this issue, we need not address HAPA's additional arguments pertaining to the trial court's breach-of-fiduciary-duty finding. *See* Tex. R. App. P. 47.1.

[38]HAPA attacks Findings of Fact Nos. 5, 7–9, 11, 18–34, 36–40.

[39]HAPA attacks Conclusions of Law Nos. 41–60.

As it relates to the trial court's conclusions of law, HAPA's entire argument is contained in the following two sentences: "The court should review Conclusions of Law Nos. 41–60 *de novo* as the conclusions drawn from the facts are incorrect. The trial court's judgment is not correct and requires reversal." We hold that HAPA's cursory, global attacks on the trial court's conclusions of law are waived due to inadequate briefing. *See* Tex. R. App. P. 38.1(i); *Catamount Props. 2018, LLC v. Guild Mortg. Co., LLC*, No. 05-23-00585-CV, 2025 WL 1285856, at *5 (Tex. App.—Dallas May 1, 2025, pet. denied) (mem. op.) (holding that appellant's "global[] attacks" on the trial court's findings of fact and conclusions of law that "ma[de] no effort to demonstrate . . . how any specific finding diverged from the evidence presented at trial" were "waived for failing to provide substantive briefing on the matter"); *Payne v. Highland Homes, Ltd.*, No. 02-14-00067-CV, 2016 WL 3569533, at *2 (Tex. App.—Fort Worth June 30, 2016, no pet.) (mem. op.) ("Bare assertions of error, without argument or authority, waive error."); *Helitrans Co. v. Rotorcraft Leasing Co., LLC*, No. 01-13-00145-CV, 2015 WL 593310, at *3 (Tex. App.—Houston [1st Dist.] Feb. 12, 2015, no pet.) (mem. op.) (holding that appellant failed to adequately brief challenge to conclusions of law when it only stated which conclusions it challenged without providing argument demonstrating that the conclusions were erroneous).

HAPA's challenges to twenty-seven of the trial court's findings of fact do not fare much better. With the exception of one challenge—a challenge to Finding of Fact No. 25 that we will discuss below—HAPA's challenges fail to provide

66

substantive analysis and fail to explain how our granting of the challenges would lead to a reversible judgment.[40] We hold that—with the exception of HAPA's challenge to Finding of Fact No. 25—HAPA's cursory, bare-bones attacks on the trial court's findings of fact are waived due to inadequate briefing. *See Hoskin v. Hoskin*, No. 02-24-00240-CV, 2025 WL 1909326, at *9 (Tex. App.—Fort Worth July 10, 2025, no

---

[40]As examples, HAPA's brief includes such bare-bones challenges as the following:

- "Finding of Fact No. 18, is legally and factually insufficient. No 60% vote is required to secure Airfield gates."

- "Finding of Fact No. 21, is factually and legally insufficient. Facilities of a 501(c)(7) should not be accessible or used for public accommodation."

- "Finding of Fact No. 22, is factually and legally insufficient, finding HAPA prevented Appellees from sharing gate codes with the public. To maintain tax-exempt status HAPA's gate codes should not be shared with the general public."

- "Finding of Fact No. 23, is factually and legally insufficient, finding Southlake [Hospitality] did more to promote safety to the public than HAPA, as a 501(c)(7) social club, HAPA is not required to educate the general public."

- "Finding of Fact No. 26, is legally insufficient in finding the listed businesses are airport-related commercial businesses. Rather the contrary was shown."

- "Finding of Fact No. 30, is legally and factually insufficient. HAPA is a 501(c)(7) according to the IRS, and not a commercial property management association."

- "Finding of Fact No. 33, is legally and factually insufficient, relating to a trophy company on the Airfield. The business was grandfathered with the Fifth Amendment."

pet.) (mem. op.) (holding that appellant's complaints regarding findings of fact were inadequately briefed when appellant made "conclusory statements that [were] unsupported by argument or citation"); *Hollis v. Acclaim Physician Grp., Inc.*, No. 02-19-00062-CV, 2019 WL 3334617, at *3 (Tex. App.—Fort Worth July 25, 2019, no pet.) (per curiam) (mem. op.) (holding that briefing requirements are not met "by merely uttering brief conclusory statements, unsupported by legal citations"); *Helitrans Co.*, 2015 WL 593310, at *3 (holding that appellant failed to adequately brief challenge to findings of fact when it only stated which findings it challenged without providing argument "demonstrating that the trial court's findings of fact were without evidentiary support in the record"); *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 456 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that appellant's challenge to finding of fact was inadequately briefed when it contained "no argument, analysis, or legal authorities to support its assertion").

As to Finding of Fact No. 25, HAPA complains that there was no evidence of damages with respect to Rio Concho's tortious-interference claim. As noted above, we are reversing the trial court's tortious-interference judgment because there was no evidence of damages. Accordingly, we sustain HAPA's complaint regarding Finding of Fact No. 25, and we overrule HAPA's remaining challenges to the trial court's findings of fact and conclusions of law.

**E. HAPA's Complaint Regarding the Trial Court's Awards of Attorney's Fees**

In its fifth issue, HAPA argues that the trial court erred by awarding attorney's fees to Appellees. The complained-of awards were based on the trial court's declaratory-judgment rulings in favor of Appellees. *See* Tex. Civ. Prac. & Rem. Code § 37.009 (stating that, in any proceeding under the Uniform Declaratory Judgments Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just").

Because we have sustained portions of HAPA's first issue complaining about the trial court's declaratory-judgment rulings and are reversing some of the trial court's declarations, we must reverse the trial court's awards of attorney's fees and remand the issue of attorney's fees to the trial court. *See Waldrop v. Waldrop*, 552 S.W.3d 396, 411 (Tex. App.—Fort Worth 2018, no pet.) (en banc) (op. on reh'g) (reversing award of attorney's fees and remanding that issue to trial court after reversing part of trial court's declaratory-judgment ruling); *Grohman-Kahlig v. Kahlig*, No. 04-07-00468-CV, 2008 WL 5377704, at *1 (Tex. App.—San Antonio Dec. 17, 2008, no pet.) (mem. op.) (op. on reh'g) ("[B]ecause we reverse the portion of the trial court's judgment granting the declaratory relief, we also reverse the award of attorney's fees and remand the cause to determine, in part, what award of attorney's fees, if any, is equitable and just in light of our holdings." (internal quotation marks omitted)).

We thus sustain HAPA's fifth issue.

## IV. CONCLUSION

Having sustained parts of HAPA's first issue, we reverse the trial court's declarations that "HAPA board members may not serve as members of the [ACC] and that no valid [ACC] existed at the time of the design and construction of the safety barrier on Area H"; that "Rio Concho is the assignee of [the] Airfield's Declarant as to all rights and privileges of the Declarant on Area H as stated in the Original Declaration" and that such rights and privileges "result in HAPA having limited authority over Area H"; and that "HAPA [had] abandoned its restriction that lots must be used only for aircraft hangars, general office use, or airport-related commercial businesses." We affirm the remaining declarations of the trial court in the amended final judgment.

Having sustained parts of HAPA's second issue, we reverse the trial court's injunction directing HAPA "to undertake a traffic safety study conducted by a qualified firm to recommend changes designed to prevent land vehicles from making dangerous incursions onto the runway" and enjoining HAPA from "asserting, sending notices, or assessing fines based on allegations that Rio Concho or Southlake [Hospitality] violated the CCRs by permitting unapproved signage on Area H, erecting all current additions and improvements to the former administration building on Area H, and constructing the safety barrier on Area H." We affirm the remaining injunctive relief in the amended final judgment.

Having sustained HAPA's third issue and its fourth issue to the extent that it challenged Finding of Fact No. 25, we reverse the trial court's awards of damages stemming from HAPA's alleged tortious interference and breaches of fiduciary duties, and we enter take-nothing judgments on Appellees' tortious-interference and breach-of-fiduciary duty claims.

Finally, having sustained HAPA's fifth issue, we reverse the trial court's awards of attorney's fees and remand the issue of attorney's fees to the trial court.

All remaining portions of the amended final judgment are affirmed.

/s/ Dana Womack

Dana Womack
Justice

Delivered: June 11, 2026